BAILEY, LIEUTENANT-GOVERNOR, v. ABINGTON.

4-6369 148 S. W. 2nd 176

Opinion delivered March 3, 1941.

 

*Jack Holt,* Attorney General, and *Leffel Gentry,* Assistant Attorney General, for appellant.

*E. L. McHaney, Jr.,* and *Walter L. Pope,* for appellee.

MEHAFFY, J. On February 10, 1941, the appellant, as Lieutenant-Governor of Arkansas, and as the presiding officer of the Senate of the Fifty-third General Assembly, announced that pursuant to the mandate of amendment No. 23 to the Constitution of the state of Arkansas, he would cause a determination by lot to be made to determine the seventeen senators who should hold for a term of four years, and the eighteen senators who should hold a term of two years. He announced that such determination would be made at two o'clock on February 13, 1941.

The appellees, seventeen in number, are all members of the Senate of the Fifty-third General Assembly, and each of them was elected at the general election in November, 1940.

This action was instituted by the appellees, seeking an order to enjoin the appellant from causing to be made the determination by lot.

The appellant filed a demurrer, which was overruled by the court, and the court then entered a decree restraining appellant, Bob Bailey, both individually and as Lieutenant-Governor and presiding officer of the Senate of the Fifty-third General Assembly, from holding a determination by lot as to the terms of senators

on February 13, 1941, or at all. This appeal is prosecuted to reverse this decree.

There is no allegation in the complaint against Bob Bailey individually, and he would, of course, have no authority individually to require the Senate to do anything. The decree, therefore, restraining him individually was erroneous.

As stated by the attorneys, this controversy is one of first impression in this court. We have, therefore, no precedent to follow.

Amendment No. 23 was adopted in 1937, and it created a Board of Apportionment, consisting of the Governor, Secretary of State and the Attorney General. Section 2 of the amendment relates to the membership of the House of Representatives. Section 3 provides for a Senate of 35 members, and further provides:

"The 'Board of Apportionment' hereby created shall from time to time divide the state into convenient senatorial districts in such manner as that the Senate shall be based upon the inhabitants of the state, each senator representing as nearly as practicable an equal number thereof; each district shall have at least one senator."

Section 4 provides: "The Board shall make the first apportionment hereunder within ninety days from January 1, 1937; thereafter on or before February 1, immediately following each Federal Census, said Board shall reapportion the state for both representatives and senators, and in each instance said Board shall file its report with the Secretary of State, setting forth (a) the basis of population adopted for representatives; (b) the basis for senators; (c) the number of representatives assigned to each county; (d) the counties comprising each senatorial district and the number of senators assigned to each, whereupon, after thirty days from such filing date, the apportionment thus made shall become effective, unless proceedings for revision be instituted in the Supreme Court within such period."

Section 5 provides for the manner in which the Board may be compelled to act, and § 6 provides as follows: "At the next general election for state and county officers ensuing after any such apportionment, senators and representatives shall be elected in accordance therewith, and their respective terms of office shall begin on January 1 next following. At the first regular session succeeding any apportionment so made the Senate shall be divided into two classes by lot, eighteen of whom shall serve for a period of two years, and the remaining seventeen for four years, after which all shall be elected for four years until the next reapportionment hereunder."

This court said, in construing a constitutional amendment: "At the outset, it may be stated, that substance is more to be desired than form; and the will of the people, as expressed in the amendment, should be declared according to the plain and ordinary words used unless another and different meaning has been plainly expressed. It will be noted that the amendment provides that it shall be in substitution of the Initiative and Referendum Amendment approved February 9, 1909, and that said amendment and the act of the General Assembly to carry out the same approved June 30, 1911, so far as the same is in conflict herewith, be and the same are hereby repealed. This manifestly indicates the will of the people to leave in force the act of the General Assembly approved June 30, 1911, which was for the purpose of carrying out the original amendment, except in so far as it is repugnant to or in conflict with the present amendment." *Townsend* v. *McDonald,* 184 Ark. 273, 42 S. W. 2d 410.

It will be observed that § 3 of the amendment provides that the Board shall from time to time divide the state into convenient senatorial districts in such manner that the Senate shall be based upon the inhabitants of the state, each senator representing, as nearly as practicable, an equal number thereof. We think it is clear from this section that it was the intention of the people, in adopting this statute, to divide the state into con-

venient senatorial districts and to provide for the number of representatives in each county, and manifestly the reason for their using the expression "from time to time" was to indicate that this apportionment should be made when, and only when, there was a change in the population so that, without a reapportionment, the senator would not represent the number specified.

Section 4 provides that the first apportionment shall be made within 90 days from January 1, 1937, and that thereafter, on or before February 1 immediately following each census, the Board should reapportion the state for both senators and representatives, and in each instance said board is required to file its report with the Secretary of State, setting forth the basis of population adopted for representatives and the basis for senators.

Section 6 of the amendment provides that at the general election for state and county officers ensuing after any such apportionment, senators and representatives shall be elected in accordance therewith, and their respective terms of office shall begin on January 1 next following. It also provides that at the first regular session after the apportionment the Senate shall be divided into two classes by lot, eighteen of whom shall serve for a period of two years, and seventeen of whom shall serve for four years, after which all shall be elected for four years until the next reapportionment is made.

The seventeen senators who are appellees in this case were elected at the last election for four years. This amendment provides that they shall be elected for four years until the next reapportionment hereunder. There has been no reapportionment, no necessity or occasion for any; there has been no change in population that makes it necessary or advisable; and to require them to determine by lot, under the circumstances, would limit the term of office of some of the senators, who were elected for four years, to only two years. It would also have the effect of extending the term of other senators to six years. Evidently the people, in adopting this amendment, did not intend that such an unreasonable thing should happen. It was not the intention of the

amendment to select by lot except after an apportionment or reapportionment, and when there has been no reapportionment, we think it would be unreasonable to hold that a procedure should be followed that would reduce the term of some of the senators to two years, and necessarily extend the term of others to six years, when they were all elected for four years.

"It often happens that the true intention of the lawmaking body, though obvious, is not expressed by the language employed in a statute when that language is given its literal meaning. In such cases, the carrying out of the legislative intention, which, as we have seen, is the prime and sole object of all rules of construction, can only be accomplished by departure from the literal interpretation of the language employed. Hence, the courts are not always confined to the literal meaning of a statute; the real purpose and intent of the Legislature will prevail over the literal import of the words. When the intention of a statute is plainly discernible from its provisions that intention is as obligatory as the letter of the statute, and will even prevail over the strict letter. The reason of the law, as indicated by its general terms, should prevail over its letter, when the plain purpose of the act will be defeated by strict adherence to its verbiage. It is frequently the case that, in order to harmonize conflicting provisions and to effectuate the intention and purpose of the lawmaking power, courts must either restrict or enlarge the ordinary meaning of words. The legislative intention, as collected from an examination of the whole as well as the separate parts of a statute, will prevail over the literal import of particular terms, and will control the strict letter of the statute, where an adherence to such strict letter would lead to injustice, to absurdity, or contradictory provisions. It is an old and unshaken rule in the construction of statutes that the intention of a remedial statute will always prevail over the literal sense of its terms, and therefore when the expression is special or particular, but the reason is general, the expression should be deemed general. It is also an old and well established rule of the common law, applicable to all written instruments, that

*'verba intentioni, non e contra, debebt inservire';* that is to say, words ought to be more subservient to the intent, and not the intent to the words. Every statute, it has been said, should be expounded, not according to the letter, but according to the meaning; for he who considers merely the letter of an instrument goes but skin deep into its meaning.'' 25 R. C. L. 967, 968.

''In pursuance of the general object of giving effect to the intention of the Legislature, the courts are not controlled by the literal meaning of the language of the statute, but the spirit or intention of the law prevails over the letter thereof, it being generally recognized that whatever is within the spirit of the statute is within the statute although it is not within the letter thereof, while that which is within the letter, although not within the spirit, is not within the statute. Effect will be given the real intention even though contrary to the letter of the law. The rule of construction according to the spirit of the law is especially applicable where adherence to the letter would result in absurdity or injustice, or would lead to contradictions, or would defeat the plain purpose of the act, or where the provision was inserted through inadvertence. In following this rule, words may be modified or rejected and others substituted, or words and phrases may be transposed. So the meaning of general language may be restrained by the spirit or reason of the statute, and may be construed to admit implied exceptions.'' 59 C. J. 964, *et seq.*

''Apportionment'' and ''reapportionment'' used in the amendment, necessarily mean the dividing of the state into districts so that each district has a certain population, and dividing the representatives and senators so that each county shall have representation according to its population.

''The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and of the people who adopted it. The court, therefore, should constantly keep in mind the object sought to be accomplished by its adoption, and the evils, if any, sought to be prevented or remedied. Effect

should be given to the purpose indicated by a fair interpretation of the language used. The intent may be shown by implications as well as by express provisions." 16 C. J. S. 51.

The rules governing the construction of constitutional amendments are the same as those governing the construction of statutes. We are of the opinion that by the adoption of amendment No. 23, the people intended to correct certain evils that then existed; some counties with a small population having more representatives than others with a larger population; and the same was true as to senatorial districts. This evil was corrected by the apportionment provided for, but if construed as contended for by appellant, we would not only correct that evil, but create a worse one. We do not think that the Legislature intended that the amendment should be so construed as to deprive persons who were elected for four years of two years of their terms, and give others, who were elected for four years, a six-year term.

The decree of the chancery court restraining Bob Bailey as Lieutenant-Governor and presiding officer of the Senate is affirmed.

GRIFFIN SMITH, C. J., (concurring). I am in accord with the court's holding that Amendment No. 23 and action of the board of apportionment do not require that the terms of senators should have been determined by drawing lots during the regular session of the Fifty-third general assembly.

The only question for decision was whether the Pulaski chancery court erred in issuing the restraining order. We all agree that it did not; but much of the opinion is dictum, and if intended as an indication of the court's construction of the amendment as a whole it is misleading.

The first paragraph of the board's report to the secretary of state[1] is:

"In compliance with the requirements of Amendment No. 23 to the constitution of the state of Arkansas,

---

[1] The report is dated January 21, 1941.

the board of apportionment, consisting of the governor, secretary of state, and attorney general, *hereby submits the following reapportionment.*" [2]

Without referring to the apportionment of 1937, the board assigned to 59 counties one representative each, to each of eleven counties two representatives, to each of four counties, three representatives and to one county seven representatives. Nine senatorial districts include but one county each, fifteen districts are composed of two counties each, nine districts comprise three counties each, one district is made up of four counties, and one district includes five counties.

Following these apportionments it was said: "The board, in submitting this reapportionment report, after giving the matter careful consideration, was of the opinion that the above was the most satisfactory solution and that it complies with the provisions of Amendment No. 23." [3]

Amendment No. 23 amends art. 8 of the constitution of 1874. Section 4 of art. 8 directed that the state should be divided into senatorial districts and that apportionment of representation to the several counties should be made by the general assembly ". . . at the first regular session after each enumeration of the inhabitants of the state by the federal or state government shall have been ascertained, and at no other time."

It is a matter of common knowledge that the general assembly's construction of the quoted language—that is, whether it was mandatory or discretionary—was not in harmony with the beliefs of those who initiated Amendment No. 23 and the people who adopted it. Emphasis of the amendment's purpose is found in § 1 where it is declared the *"imperative* duty" [4] of the board to make apportionments in accordance with provisions of the amendment.

---

[2] Italics supplied.

[3] It was also said in the report: "The basis of population from the 1940 census of Arkansas, adopted for representative, is 19,482. The basis of population from the 1940 census of Arkansas, adopted for senator, is 55,664."

[4] Italics supplied.

In the majority opinion it is said: "It was the intention of the people, in adopting the amendment, to divide the state into convenient senatorial districts and to provide for the number of representatives in each county, and manifestly the reason for their using the expression 'from time to time' was to indicate that this apportionment should be made when, and only when, there was a change in the population so that, without a reapportionment, the senator would not represent the number specified."

The reasoning is wrong in two respects: First, the amendment does not divide the state into districts or apportion representatives;[5] it delegates that function to the board. Secondly, the expression "from time to time" must be read in connection with § 4 of the amendment which directs the board to reapportion "following each federal census."[6]

Section 5 of the amendment vests in the supreme court original jurisdiction to compel the board, by mandamus or otherwise, to perform its duties, and authorizes the court to revise any arbitrary action. Any "citizen and taxpayer" is given the right to proceed against the board to compel apportionment if it refuses to act, or to have its actions reviewed on the ground that discretion has been abused.[7]

Whether the board had before it evidence that the tabulation of census enumerations by counties had become official is not shown.[8] Amendment No. 23 does not pro-

---

[5] There is a limitation that the house of representatives shall consist of one hundred members and that each county shall have at least one representative; also that there shall be thirty-five members of the senate, that senatorial districts shall consist of contiguous territory, and no county shall be divided in the formation of such districts.

[6] Section 4 required the board to make the first apportionment within ninety days from January 1, 1937; "thereafter," on or before February 1 immediately following each federal census."

[7] Application to have the board's actions on revisions reviewed must be made "within thirty days after the filing of the report of reapportionment . . . with the secretary of state."

[8] The decennial census provided for by the act of Congress of March 3, 1919 (shown as Ch. 2 of Title 13, USCA) was superseded by the act of Congress of June 18, 1929, as amended. (See Ch. 4, § 201, Title 13, Cumulative Annual Pocket Part, 1940).

The decennial census period when all reports and entries shall be completed is three years after the first of January, 1930, and every

vide for apportionment until the census has been completed.

In the fifteenth paragraph of the majority opinion it is said: "There has been no reapportionment, no necessity or occasion for any; there has been no change in population that makes it necessary or advisable."

That there has been reapportionment seems too apparent to justify argument. The board certified there had been, and the amendment required it. No changes were made; but, with certification that "the following reapportionment" had been officially made, the apportionment of 1937, *ipso facto,* expired.

It is a mistake to assume that change in population, and nothing else, makes reapportionment "advisable." It is not a question of *advisability,* but one of constitutional demand.

Section 6 of the amendment provides that "At the next general election for state and county officers ensuing after any such apportionment, senators and representatives shall be elected in accordance therewith and their respective terms of office shall begin on January 1 next following."

There are now pending before this court suits from Pulaski, Poinsett, and Mississippi counties, questioning the board's action of January 21 in apportioning representation in the lower house. If there has been no reapportionment the actions are futile. If it should be determined that the board is in error as to any of the three counties in whose behalf appeals were perfected, is it sound to say that the amendment is severable, and that in order to conform to dictum in the majority opinion we are at liberty to treat the board's action as a reapportionment of the house of representatives, but hold that as to the senate there was no action? Certainly not.

tenth year thereafter. There is a proviso that "the tabulation of total population by states as required for the apportion of representatives shall be completed within eight months from the beginning of the enumeration and reported by the director of the census to the secretary of commerce and by him to the president of the United States."

[January 4, 1941, the bureau of the census issued a press release giving final 1940 population figures for Arkansas by counties and incorporated places, and on February 8 for minor civil divisions of counties in Arkansas.]