SMITH *v.* THE BOARD OF APPORTIONMENT.*

4-9607                                    243 S. W. 2d 755

Opinion delivered December 3, 1951.

* See *Pickens* v. *Board of Apportionment,* 220 Ark. _____, 243 S. W. 2nd 755.

*Goodwin & Riffel,* for petitioners.

*Ike Murry,* Attorney General, and *Cleveland Holland,* Assistant Attorney General, for respondent.

*Bailey & Warren,* for interveners.

GRIFFIN SMITH, Chief Justice. This is an original proceeding under Amendment No. 23 to the Constitution. See *Bailey, Lieutenant Governor,* v. *Abington,* 201 Ark. 1072, 148 S. W. 2d 176, 149 S. W. 2d 573; *Shaw, Autry and Shofner* v. *Adkins, Governor,* 202 Ark. 856, 153 S. W. 2d 415; *Butler* v. *Democratic State Committee,* 204 Ark. 14, 160 S. W. 2d 494. Only the House of Representatives was involved in the Shaw case.

Clyde E. Smith and Floyd H. Fulkerson, Jr., are citizens and taxpayers of Pulaski county. Their contention is that the Thirteenth senatorial district, composed of Pulaski county alone, is discriminated against in that it has but two senators. The Federal census for 1950, gives a population total of 196,685, an increase of 40,600 since 1940, or 26.01%. For the state as a whole the population is 1,909,511—a loss of 39,876 during the decennial period. Before the official figures for 1950 had been certified a citizen-taxpayer suit was brought against the Board, but this court held that the action was premature. *Carpenter* v. *Board of Apportionment,* 218 Ark. 404, 236 S. W. 2d 582.

In the controversy now before us two members of the Board—the Attorney General and the Secretary of State—felt that when all difficulties incidental to reapportionment were considered, such as territorial area of counties, convenience of electors when a grouping for district purposes is made, etc., no fairer plan than the present setup could be devised. The Governor as a mem-

ber of the Board took the position that present population extremes were too great to justify inaction, hence the equalities contemplated by the Constitution, as amended, were of a nature overriding the secondary considerations his co-members had in mind. The Governor's suggested rearrangement was not satisfactory to the majority, therefore redistricting as an accomplished fact, but without change of any kind, was certified.

This procedure had the effect of leaving the Thirteenth district under-represented from a numerical standpoint by a percentage equation of 80.26. Inequalities in other districts will be referred to.

The decisions construing Amendment No. 23 to which attention has been called mention the political reasons underlying popular action in adopting the Amendment.

The comprehensive measure affecting senatorial districts prior to 1937 was Act 129 of 1901, p. 201. Under the reorganization there effectuated the First district included Clay, Greene, and Craighead counties.[1] Section 2 of Art. 8 of the Constitution of 1874 was a mandate to the legislature to divide the state into convenient districts from time to time in such manner that the senate would be based upon the state's adult population, each senator as nearly as practical to represent an equal number of male inhabitants.[2] The districts were created, temporarily as it was then thought, until the population of counties as reflected by the Federal census of 1880 should become available as the basis of a better plan.

Amendment No. 23 imposes upon the Apportionment Board the *imperative duty* of making assignments of senators to districts as created. Section 3 fixes membership of the senate at 35. Districts shall consist of contiguous territory, but a county must not be divided. With these limitations upon the one hand and affirmative mandates upon the other, the state is to be divided into convenient districts ". . . in such manner that the

[1] Through misprision Craighead county appears in the printed Acts of 1901 as Crawford county.

[2] The first Federal census was taken in 1790.

senate shall be based upon the inhabitants of the state, each senator representing, as nearly as practicable, an equal number thereof, [and] each district shall have at least one senator.'' It will be noted that some of the language of the Amendment is so harmonious with certain expressions in § 2 of Art. 8 of the Constitution of 1874 as to suggest that the phrasing was copied.

When the reapportionment Act of 1901 was adopted the state's population was 1,311,564. Pulaski and Perry counties were combined as the Tenth district and given two senators. The result was that there were 34 districts with 35 senators. Had it been possible to arrange the districts on an equal population basis, each would have included 37,473, minus; but, then as now, exact apportionment was impossible without dividing counties.

From 1901 until after the adoption of Amendment No. 23 in 1936,[3] nothing effective looking to equal senatorial representation was done; but, with the Amendment as a current mandate from the people, and with a population increase of 542,918 during the thirty years from 1900 to 1930,[4] the reapportionment as it existed in 1941 when the Bailey-Abington decision was handed down was the subject of legislative controversy and judicial determination—that is, the senatorial reapportionment of 1937 based on the 1930 Federal census was permitted to stand, irrespective of changes shown by the 1940 enumeration.

In the reshuffle of 1937 District No. 1 was created by combining Benton and Carroll counties in the northwestern corner of the state, as distinguished from District No. 1 established in 1901 by joining Clay, Greene and Craighead counties in the northeastern area. The 1901 and 1950 districts, with the population of each, are shown in comparative parallel columns:

---

[3] The Amendment was voted on at the November, 1936, election and declared adopted by the speaker of the house of representatives January 12, 1937.

[4] Difference between 1,311,564 and 1,854,482.

| 1901 | | | 1950 | | |
|---|---|---|---|---|---|
| *Dist.* *No.* | *Counties* | *Population* | *Dist.* *No.* | *Counties* | *Population* |
| 1.—Greene, Clay, Craighead | | 52,370 | 1.—Benton, Carroll | | 51,320 |
| 2.—Randolph, Lawrence, Sharp | | 45,846 | 2.—Washington, Madison | | 61,713 |
| 3.—Marion, Boone, Newton | | 40,311 | 3.—Crawford, Franklin, Johnson | | 51,223 |
| 4.—Johnson, Pope | | 39,163 | 4.—Sebastian alone | | 64,202 |
| 5.—Washington alone | | 34,256 | 5.—Scott, Polk, Logan | | 44,499 |
| 6.—Independence, Stone | | 30,657 | 6.—Howard, Sevier, Little River | | 37,325 |
| 7.—Cross, Woodruff | | 27,355 | 7.—Boone, Marion, Baxter, Newton, Searcy | | 55,661 |
| 8.—Yell, Logan | | 43,313 | 8.—Pope, Yell | | 37,348 |
| 9.—Saline, Hot Spring, Grant | | 33,541 | 9.—Hempstead, Pike, Montgomery | | 41,792 |
| 10.—Pulaski, Perry | | 70,473 | 10.—Miller, Lafayette | | 45,817 |
| 11.—Jefferson alone | | 40,972 | 11.—Fulton, Izard, Stone, Van Buren, Cleburne | | 47,976 |
| 12.—Lonoke, Prairie | | 34,419 | 12.—Faulkner, Conway, Perry | | 49,404 |
| 13.—Arkansas, Monroe | | 29,789 | 13.—Pulaski alone | | 196,685 |
| 14.—Lee, Phillips | | 45,970 | 14.—Garland, Saline | | 70,918 |
| 15.—Ashley, Chicot | | 34,262 | 15.—Hot Spring, Clark, Grant | | 54,203 |
| 16.—Lincoln, Cleveland, Dallas | | 36,527 | 16.—Ouachita, Dallas, Cleveland | | 54,423 |
| 17.—Drew, Desha | | 30,962 | 17.—Nevada, Columbia | | 43,551 |
| 18.—Bradley, Union | | 32,146 | 18.—Union alone | | 49,686 |
| 19.—Calhoun, Ouachita | | 29,431 | 19.—Randolph, Sharp, Lawrence | | 46,284 |
| 20.—Hempstead, Nevada | | 40,710 | 20.—Independence, Jackson | | 49,400 |
| 21.—Columbia, Lafayette, Miller | | 50,229 | 21.—White, Woodruff | | 56,997 |
| 22.—Little River, Sevier, Howard | | 44,146 | 22.—Lonoke, Prairie | | 41,046 |
| 23.—Fulton, Izard, Baxter | | 35,721 | 23.—Jefferson alone | | 76,075 |
| 24.—Carroll, Madison | | 38,712 | 24.—Arkansas, Monroe | | 43,905 |
| 25.—Crawford, Franklin | | 38,665 | 25.—Desha, Lincoln | | 42,234 |
| 26.—Searcy, Cleburne, Van Buren, Conway | | 52,608 | 26.—Calhoun, Bradley, Drew | | 41,078 |
| 27.—White, Faulkner | | 45,644 | 27.—Ashley, Chicot | | 47,966 |
| 28.—Sebastian alone | | 36,935 | 28.—Clay, Greene | | 55,823 |
| 29.—Poinsett, Jackson, Mississippi | | 41,792 | 29.—Craighead alone | | 50,613 |
| 30.—Clark, Pike | | 31,590 | 30.—Mississippi alone | | 82,375 |
| 31.—Garland, Montgomery | | 28,217 | 31.—Poinsett, Cross | | 64,068 |
| 32.—Crittenden, St. Francis | | 31,686 | 32.—Crittenden alone | | 47,184 |
| 33.—Scott, Polk | | 31,535 | 33.—St. Francis, Lee | | 61,163 |
| 34.—Benton alone | | 31,611 | 34.—Phillips alone | | 46,254 |

Although the petitioners are citizens of Pulaski county and the Thirteenth senatorial district, the objections they offer to the Board's plan of reapportionment without change is in a sense state-wide. The basis for apportionment is a district, but the senator [or senators]

from that district represents all of the people. If this were not true block voting responsive to area interests would militate against the welfare of the commonwealth as a whole.

The census for 1950 shows that equal representation could be attained only if each senator's assigned population were 1/35th of 1,909,511—that is, 54,557. Some of the districts, notably the 15th and 16th, are affected by mathematical inequalities of less than one percent. Thus, the 15th district (Hot Spring, Clark, and Grant counties) has a population of 54,203, a deviation of 354 from the standard, or .65%. The 16th district (Ouachita, Dallas, and Cleveland) is even closer, the differential being one-fourth of one percent.

The 7th district (Boone, Marion, Baxter, Newton, and Searcy) comes next and is within 2.02% of the standard. It is followed by the 28th (Greene and Clay), with a variant of 2.32%. Next is the 1st (Benton and Carroll) with 5.93%, followed by the 3d (Crawford, Franklin, and Johnson), with 6.11%; the 21st (White and Woodruff) with 4.47%; the 29th (Craighead county alone) with 7.23%; the 12th (Faulkner, Conway, and Perry) with 9.45%, and the 20th (Independence and Jackson), also with 9.45%. Some of the other districts showing over or under variants of more than 20% are: The 30th (Mississippi county alone), under-represented by 50.99%; the 23d (Jefferson county alone), under-represented 39.44%; the 14th (Garland and Saline) under-represented 29.99%; the 6th (Howard, Sevier, Little River), over-represented 31.59%; the 8th (Pope and Yell) over-represented 31.54%. Other districts over-represented more than twenty percent are: The 22d (Lonoke and Prairie), 24.76%; the 26th (Calhoun, Drew, and Bradley), 24.71%; the 9th (Hempstead, Pike, Montgomery), 23.40%; the 25th (Desha and Lincoln), 22.59%; the 24th (Arkansas and Monroe), 20.81%, and the 17th (Nevada and Columbia), 20.17%.

In the Butler case Mr. Justice FRANK G. SMITH recognized what is now argued by the respondents—that the Amendment does not require geographical changes

after each census; but, says the opinion, the people's mandate does compel redistricting with rearrangements ". . . if shifting population makes that action necessary [in order] to afford *just, equitable, and equal representation*." The primary reason given by the Board's majority for not recognizing Pulaski county's claim to a third senator, if it is to remain a separate district, is that shift in population alone during the preceding decade did not warrant disarrangement of other districts.

An examination of this argument from a population standpoint gives this result: In 1940 Pulaski's population was 156,085. The census gave the state 1,949,387, hence the nearest possible basis for a thirty-fifth representation would be 55,697. It follows that at that time the two senators were assigned to a district with 44,691 more people than the mathematical equity suggested, and that each had an overburden of 22,346 if the matter should be considered from a personnel standpoint. Now this non-representation has grown to 87,571, or 43,786 per senator. But this is not all. Three times the mathematical average of 54,557 would account for a population of but 163,671. So, if a third senator is added there will still be 33,014 above the mathematical standard, or 65,561 per senator.

The contention that other considerations contemplated by Amendment No. 23 outweigh the population factor is one that can always be made, and this argument, if conclusive, might forever defeat the clear intention of those who framed the Amendment and the people who adopted it. If an under-representation of eighty percent does not supply the factor emphasized in Butler's case, then ninety percent, or even a hundred percent, could with reason as relatively applicable be urged in derogation of redistricting.

We conclude that the citizens' petition is meritorious and that the Thirteenth district must be assigned a third senator.

The final question is whether the work should be done by this court or the Board. Section 4 of the Amendment directs the Board to reapportion following each

Federal census. Section 5 authorizes mandamus to compel the Board to act. Quite clearly this court has the power (in view of the holding in the Butler case that there could be reapportionment without change) to perform the work necessary to revision; but the Board, acting both administratively and legislatively, is primarily charged with that duty. We therefore reverse and remand, with directions to the Board to make an apportionment allowing Pulaski county—or the district of which it is made a part—at least three senators. In accomplishing this end the Board has, of course, the right to make such other changes as an equitable distribution into correctly-created districts may demand.

It is further directed that reapportionment be completed on or before February 1, 1952.

Mr. Justice McFADDIN and Mr. Justice MILLWEE dissent.

ED. F. McFADDIN, Justice (Dissenting). The majority is holding (I) that the petition for senatorial redistricting should be granted; and (II) that the cause should be remanded to the Board of Apportionment to accomplish such redistricting. I dissent from each holding and give my reasons as follows:

I. *The Petition Should Not Be Granted For At Least Two Reasons.*

(A) Petitioners filed in this court their pleading which (1) set up the 1950 census figures of the various counties in Arkansas; (2) stated that the Board of Apportionment had failed, in the face of such figures, to redistrict senatorial districts of the State so as to give Pulaski County three senators; and (3) alleged that the Board of Apportionment "arbitrarily declined and refused" to change the senatorial districts as now constituted. The Board of Apportionment in its response to the petition said:

"They deny that in making such apportionment they acted arbitrary or abused the discretion vested in them by the Constitution, but on the contrary that they acted in good faith and to the best of their ability they discharged

the duty placed upon them by the Constitution in making such apportionment."

Thus the issue was framed as to whether the Board of Apportionment had acted arbitrarily in refusing to give Pulaski County three senators because of its population increase. What is the meaning of the word "arbitrarily"? It is the adverb of the adjective "arbitrary", which adjective Webster defines as "Despotic; absolute in power; bound by no law; fixed or arrived at through an exercise of will or by caprice without consideration or adjustment with reference to principles; circumstances, or significance;.decisive but unreasoned; . . ." In the light of these definitions, to say, that the action of the Board of Apportionment is arbitrary, is certainly a serious charge leveled by the petitioners against the Governor, Attorney General and the Secretary of State, who compose the Board of Apportionment. Certainly this court should require definite proof of such a charge before solemnly sustaining it.

And what is the only proof submitted? It is the 1950 census figures of the counties in Arkansas. So on the basis of population, alone, petitioners say they should win their case. Should they? Constitutional Amendment No. 23 here involved says regarding senatorial reapportionment:

"The Senate shall consist of thirty-five members. Senatorial districts shall at all times consist of contiguous territory, and no county shall be divided in the formation of such districts. 'The Board of Apportionment' hereby created shall, from time to time, divide the State into convenient senatorial districts in such manner as that the Senate shall be based upon the inhabitants of the State, each Senator representing, as nearly as practicable, an equal number thereof; each district shall have at least one Senator."

As I read the quoted language there are at least six factors necessarily entering into consideration when the

Board of Apportionment is considering the redistricting of senatorial districts. These six factors are:

1. There must be 35 senators.

2. Districts must be composed of contiguous territories.

3. No county may be divided among different districts.

4. The board must provide for "convenient" districts.

5. Representation should be based on equal population as far as practical.

6. Each district must have at least one senator.

Only one of these requirements—*i. e.* number 5—relates to population, yet, the majority of this court is holding that the one factor of population is sufficient to override the Board's discretion on all other factors. The majority is making "arbitrary" any results reached by the Board of Apportionment which failed to use *population* as the main criterion in senatorial redistricting. I submit that the majority opinion is in error because it fails to give consideration to any factor except population. That is the only point on which the petitioners presented their case. They are in effect saying that Pulaski County is entitled to three senators regardless of the havoc that may be wrought in the other seventy-four counties in Arkansas.

(B) Another reason the petition should not be granted is because the petitioners have failed to meet the burden of offering a proposed plan of redistricting better than the existing plan. The Board of Apportionment in its resolution of May 16, 1951, offering the present plan of redistricting said:

"The Board in submitting this Reapportionment Report, after giving the matter careful consideration, was of the opinion that the above was the most satisfactory solution and that it complies with the provisions of Amendment No. 23 to the Constitution of the State of Arkansas."

The record before us discloses that one member of the Board—the Secretary of State—made the following explanation, which was concurred in by the Attorney General:

". . . that the matter of making an apportionment of the State for Senatorial Districts presents many more problems, and that it was a mathematical impossibility to make a completely equitable apportionment, that is to say, an apportionment in which each Senator would represent the same number of individuals, giving as an illustration that no two or more contiguous counties have a total population, based on the 1950 Federal Census, that equals the average district population of 54,557; (c) that he knew it to be a fact that certain changes could be made in existing districts to reduce the variations from the average, but that after giving due consideration to the problem, he did not believe there had been a large enough shift in population during the 1940-50 decade to warrant making any changes at this time in existing Senatorial District boundaries."

The Governor offered a proposed plan of redistricting which was not accepted by the Board of Apportionment. In the record before us (and we try this case on the record and the evidence before us and not on extraneous matters), the only plan offered was the one offered by the Governor. The Board considered such plan and then made its report. No one has offered into the evidence in this case any other plan. I maintain that the petitioners should have offered to this court a plan which they would have been willing to defend or else should have defended the plan that the Governor offered, which is the only plan before us except the present apportionment.

But do the petitioners do this? No. They content themselves with the bald proposition that if Pulaski County gets three senators then the petitioners are satisfied regardless of the confusion and inequality that will result to the other seventy-four counties. Until a plan is offered by the petitioners and demonstrated to be better for the entire state than the existing apportionment then I submit that the petitioners have not made out a case; and

I further submit that the court has acted in error in granting the petition with no definite plan offered.

II. *The Cause Should NOT Be REMANDED To the Board of Apportionment.* If, in spite of all that has been said, the majority continues to hold that there should be a reapportionment of the senatorial districts so as to give Pulaski County three senators, then I submit that this court should here and now make the apportionment and certify such results to the Secretary of State. Here is the language of Art. V of Amendment 23 to the Constitution:

"Original jurisdiction (to be exercised on application of any citizens and taxpayer) is hereby vested in the Supreme Court of the State (a) to compel (by mandamus or otherwise) The Board to perform its duties as here directed and (b) to revise any arbitrary action of or abuse of discretion by The Board in making any such apportionment; provided any such application for revision shall be filed with said Court within thirty days after the filing of the report of apportionment by said Board with the Secretary of State; if revised by the Court, a certified copy of its judgment shall be by the clerk thereof forthwith transmitted to the Secretary of State, and thereupon be and become a substitute for the apportionment made by the Board."

The Board of Apportionment acted on May 16, 1951, as disclosed by its report in the record before us, and the Board certified to the Secretary of State the apportionment that it made. The petitioners have convinced a majority of this court that the Board acted arbitrarily. I maintain that our only duty in such a situation is for a "revision"; and the amendment says that such "revision" shall be certified by the court to the Secretary of State.

I see no authority in the amendment for the court to require the Board of Apportionment to undertake a further reapportionment. The Board has acted. The majority has found that the Board has acted arbitrarily. It is now up to the court to make a revision. Suppose the Board of Apportionment reports to this court that it can

do no better than it has done. What will the court do then? I wait to see.

Finally, viewed from any angle this is a most important case. By its action today the Supreme Court is in effect requiring that in 1952 there must be an election in every one of the State's senatorial districts, whereas, except for this opinion only one-half of the senatorial districts would have elections.

Respectfully but most vigorously I dissent from the majority.