**John YANCEY, Plaintiff,**

v.

**Orval E. FAUBUS, Governor, Kelly Bryant, Secretary of State, Bruce Bennett, Attorney General, The Board of Apportionment, Defendants.**

**No. LR-64-C-96.**

United States District Court
E. D. Arkansas, W. D.

Jan. 28, 1965.

Thorp Thomas, Little Rock, Ark., for plaintiff.

Bruce Bennett, Atty. Gen., and Jack L. Lessenberry, Chief Asst. Atty. Gen., Little Rock, Ark., for defendants.

Before MEHAFFY, Circuit Judge, HENLEY, Chief District Judge, and YOUNG, District Judge.

HENLEY, Chief District Judge.

On June 15, 1964, the Supreme Court of the United States handed down a series of decisions, hereinafter referred to as the Reapportionment Cases, holding in substance that the Equal Protection Clause of the 14th Amendment to the Constitution of the United States requires that the membership of each house of a bicameral State legislature be apportioned so that, as nearly as practicable, each member of the respective houses represents the same number of people. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; W.M.C.A., Inc. v. Lonenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568; Maryland Committee For Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; Lucas v. Forty-Fourth Colorado General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632. Those decisions were foreshadowed by Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, decided in 1962, holding that the federal courts have jurisdiction with respect to controversies relating to State legislative apportionment.

On July 15, 1964, plaintiff herein, John Yancey, a citizen and qualified elector of Pulaski County, Arkansas, the State's most populous county, commenced this action against the Governor of Arkansas, the Arkansas Secretary of State, and the Arkansas Attorney General, attacking the existing apportionment of the membership of both houses of the Arkansas Legislature which is currently meeting in its 65th biennial session. The defendants collectively comprise the Board of Apportionment created by section 1 of Amendment 45 to the 1874 Constitution of Arkansas for the purpose of making decennial reapportionments of both the Arkansas Senate and House of Representatives in the manner prescribed by sections 2 and 3 of the Amendment.

The complaint, as amended, alleges in substance that the scheme of apportionment and reapportionment prescribed by Amendment 45 does not meet the standard laid down by the Supreme Court of the United States in the Reapportionment Cases, supra, and is invalid, and that for the same reason the present apportionment of the membership of the Legislature is invalid.[1] The prayer of the complaint is that sections 2 and 3 of the Amendment, hereinafter abstracted, be declared unconstitutional, and that the Board be required by this Court to effect a constitutional reapportionment of both the House and the Senate.

In its answer the Board denies that sections 2 and 3 of the Amendment are unconstitutional, and prays that the complaint, as amended, be dismissed.

Since the complaint challenged the constitutionality of a State constitutional provision and prayed for an injunction against the continued enforcement of that provision, a statutory court of three judges was convened pursuant to 28 U.S.C.A. §§ 2281, 2284, and the case has been submitted to that Court.

Federal subject matter jurisdiction is not questioned and has been established. It has been admitted or stipulated that plaintiff has standing to maintain the action, that the defendants constitute the Board of Apportionment to which reference has been made, and that the validity of the existing apportionment of the membership of the Arkansas Legislature is to be determined by reference to the United States Census for 1960. The materials before the Court include maps, agreed to be accurate, on which are depicted the seventy-five counties of the State, the population of each County according to the 1960 census, the twenty-six senatorial districts into which the State is subdivided, the number of representatives which each County has in the

---

1. Plaintiff does not challenge the right of the present Legislature to function as a legislative body.

House, and the number of senators which each senatorial district has in the Senate. Other facts relevant to decision are such that judicial notice may be taken of their existence.

Prior to hearing, the defendants filed a motion for a stay of the instant proceedings for the purpose of permitting reapportionment litigation in the State courts to be initiated and prosecuted to conclusion. That motion was pending when a pre-trial conference was held before the single judge to whose docket the case fell originally, and the pre-trial conference order provided that the motion for a stay and the merits of the case would be considered at a single hearing which was set for January 7, 1965.

On January 6, 1965, Hon. Clark Kinney, a member of the Arkansas House of Representatives from St. Francis County, commenced a suit against the Board in the Chancery Court of Pulaski County seeking to determine the present status of the Board and seeking to require it to make a constitutional reapportionment of the Legislature.

The hearing in this case was held on January 7. The plaintiff appeared in person and by counsel; the Board appeared by the Attorney General. At the commencement of the hearing the Board renewed its motion to stay on the basis of the Kinney litigation which has been mentioned. Plaintiff resisted the motion.

The proceedings at the hearing consisted of steps necessary to perfect the record before the Court and of oral arguments both on the motion to stay and on the merits. At the conclusion of the hearing both the motion and the merits were taken under advisement.

█ So far as the motion to stay is concerned, the Court does not see that any useful purpose would be served by withholding decision at this time on the basic federal question of whether the existing scheme of apportionment and the existing apportionment of the membership of the Arkansas Legislature are constitutionally valid. On the contrary, the Court is convinced that it is in the best interest of all concerned for this Court to adjudicate that question now. Whether the Court should go beyond that adjudication will be discussed in connection with the merits of the case. The motion for a stay of proceedings, as such, will be denied.

The Arkansas Legislature consists of a House of Representatives of 100 members, and a Senate of 35 members. At least in practice, each Representative and each Senator has one vote in his respective House. All of the Constitutions of Arkansas[2] have provided for periodic reapportionments of the Legislature on the basis of population. The responsibility for reapportionment was originally placed upon the Legislature itself, but in 1936 the voters of Arkansas adopted Amendment 23 which created a Board of Apportionment and placed in its hands the duty of reapportioning both Houses of the Legislature following each federal census, but with an initial reapportionment to be made in 1937. Acting under Amendment 23 the Board made its 1937 reapportionment and also reapportioned in 1941 and 1951. In 1956 Amendment 23 was superseded by Amendment 45 here in controversy.

As indicated, section 1 of the Amendment establishes the Board and charges it with the duty of making reapportionments. Section 2 provides that the House shall consist of 100 members with one member guaranteed to each of the State's 75 counties regardless of population. The remaining 25 seats in the House are to be equally distributed, as nearly as practicable, among the more populous counties "in accordance with a ratio to be determined by the population of said counties as shown by the Federal census next preceding any apportionment hereunder."

Section 3 of Amendment 23 had directed that the membership of the Senate,

2. The original Constitution of 1836, Article IV; the Constitution of 1861, Article IV; the Constitution of 1864, Article IV; the Constitution of 1868, Article V; and the present Constitution of 1874, Article 8.

like that of the House, be reapportioned on the basis of population with each Senator representing, as nearly as practicable, an equal number of people. Section 3 of Amendment 45, however, provides that the senatorial districts as now constituted and existing as directed by the Supreme Court of Arkansas in the case of Pickens v. Board of Apportionment, 220 Ark. 145, 246 S.W.2d 556, "shall remain the same and the number of Senators from the districts shall not be changed."

Section 4 of the Amendment provides that the Board shall file its report with the Secretary of State not later than February 1 of the year immediately following each federal census. Section 5 authorizes the Supreme Court of Arkansas by mandamus or otherwise to compel the Board to do its duty. That section also authorizes the Supreme Court in original proceedings to review Board action and to revise arbitrary or capricious apportionments, provided that such proceedings are instituted within 30 days after the report of the Board is filed with the Secretary of State.

Section 6 of the Amendment provides that at the next general election following a reapportionment Representatives shall be elected in accordance therewith, and that Senators "shall be elected henceforth according to the apportionment now existing, and their respective terms of office shall begin on January 1 next following." That section also provides that the terms of Senators shall be of four years' duration.

The case of Pickens v. Board of Apportionment mentioned in section 3 of Amendment 45 was an exercise by the Supreme Court of the power of revision conferred by section 5 of the then existing Amendment 23. The Board had made a reapportionment in 1951 following the 1950 census, but made no change in the distribution of Senate seats. The Supreme Court held that certain changes

had to be made, and put those changes into effect.

When the Supreme Court in Pickens made changes in the distribution of Senate seats, section 6 of Amendment 23 came into play. That section, as construed in Bailey v. Abington, 201 Ark. 1072, 148 S.W.2d 176, 149 S.W.2d 573, and Butler v. Democratic State Committee, 204 Ark. 14, 160 S.W.2d 494, required that following any apportionment which resulted in changes in the make-up of the Senate, the entire Senate had to be classified by lot with one class of 18 Senators having terms of two years and the other class of 17 Senators having terms of four years.[3]

When the Supreme Court of Arkansas changed the distribution of Senate seats in 1951, the Senators had to be classified under section 6 of Amendment 23, and some Senators who had been elected at the General Election of 1950 ostensibly for terms of four years found their terms foreshortened and were required to run again in 1952 rather than in 1954. Since Amendment 45 is a substantial reenactment of Amendment 23, as far as the House is concerned, it is at least inferable that the purpose of its enactment was to protect Senators from future experiences with Section 6 of Amendment 23.

The practical effect of Amendment 45 is to freeze permanently the distribution of Senate seats on the basis of the distribution of the State's population as of 1950. In other words, under Amendment 45 the Senate is no longer subject to reapportionment. As to the House, apportionment, while based on population, is limited by the guarantee of at least one Representative to every county and by the limitation of the membership of the House to 100. Thus, while the House can be reapportioned, the reapportionment is limited to 25 free seats.

Following the census of 1960 the Board in 1961 apportioned the House seats

---

3. In 1941 the Board did not change the original reapportionment which it had made in 1937, and it was held in Bailey and Butler that since there had been no changes made by the Board in senatorial apportionment, there was no necessity for a classification of Senators under section 6 of Amendment 23.

using a method designed to make as few changes as possible in the existing apportionment. The 25 free seats were distributed among 16 counties as follows:

| County | Population | Guaranteed Seat | Apportioned Seats |
|---|---|---|---|
| Pulaski | 242,980 | 1 | 7 |
| Jefferson | 81,373 | 1 | 2 |
| Mississippi | 70,174 | 1 | 2 |
| Sebastian | 66,685 | 1 | 2 |
| Washington | 55,797 | 1 | 1 |
| Union | 49,518 | 1 | 1 |
| Crittenden | 47,564 | 1 | 1 |
| Craighead | 47,303 | 1 | 1 |
| Garland | 46,697 | 1 | 1 |
| Phillips | 43,997 | 1 | 1 |
| Benton | 36,272 | 1 | 1 |
| St. Francis | 33,303 | 1 | 1 |
| White | 32,745 | 1 | 1 |
| Miller | 31,686 | 1 | 1 |
| Ouachita | 31,641 | 1 | 1 |
| Poinsett | 30,834 | 1 | 1 |
| | | 16 | 25 |

The Board's apportionment of the House seats was challenged under section 5 of Amendment 45, and was revised by the Supreme Court of Arkansas in Stevens v. Faubus, 234 Ark. 826, 354 S.W.2d 707. The Court held that the Board had misconceived its function in undertaking to make as few changes as possible, and stated that it was the function of the Board to make changes and not to preserve the status quo. The Court also held, in line with its earlier decision in Shaw, Autry and Shofner v. Adkins, 202 Ark. 856, 153 S.W.2d 415, that the House seats available for apportionment should be apportioned in a manner similar to that employed in apportioning members of the federal House of Representatives where each State is guaranteed at least one member.

The Court then proceeded to apportion the 25 free seats by employing the formula approved in Shaw, Autry and Shofner v. Adkins, supra. Under the Court's apportionment the 25 free seats went to twelve counties, hereinafter called apportioned counties, as shown by the following table:

| County | Population | Guaranteed Seat | Apportioned Seats |
|---|---|---|---|
| Pulaski | 242,980 | 1 | 10 |
| Jefferson | 81,373 | 1 | 3 |
| Mississippi | 70,174 | 1 | 2 |
| Sebastian | 66,685 | 1 | 2 |
| Washington | 55,797 | 1 | 1 |
| Union | 49,518 | 1 | 1 |
| Crittenden | 47,564 | 1 | 1 |
| Craighead | 47,303 | 1 | 1 |
| Garland | 46,697 | 1 | 1 |
| Phillips | 43,997 | 1 | 1 |
| Benton | 36,272 | 1 | 1 |
| St. Francis | 33,303 | 1 | 1 |
| | | 12 | 25 |

According to the federal census reports, the population of Arkansas declined during the decade between 1950 and 1960 from 1,909,511 to 1,786,272, and this decline was reflected in almost all of the 75 counties. However, the population of six individual counties increased. The heaviest increase was in Pulaski County which jumped from approximately 197,000 in 1950 to 242,980 in 1960. Other counties whose population increased during the period in question were Crittenden, Jefferson, Saline, Sebastian, and Washington.

Not only was there a decline in the overall population of the State, there was also a marked shift in population from rural to urban areas. Again according to the census, while the State as a whole lost 6.5 percent of its population, the population of all urban areas increased by 21.4 percent, whereas the population of rural areas declined by 20.2 percent. Manifestly, this shift in population from the rural to the urban areas of Arkansas cannot, under Amendment 45, be reflected in the make-up of the Senate, and it can be reflected in the make-up of the House only to the extent that the 25 free seats can be allocated to the more populous counties under the "equal proportions" method of distribution approved in Shaw, Autry and Shofner v. Adkins and Stevens v. Faubus, both supra.

In the first of the Reapportionment Cases, Reynolds v. Sims, supra, the Supreme Court of the United States said (p. 568 of 377 U.S., p. 1385 of 84 S.Ct.):

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."

It was also said (p. 577 of 377 U.S., p. 1389 of 84 S.Ct.):

"By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."

It was recognized in Sims that a State may deviate somewhat from a strict population basis of apportionment for the purpose of "insuring some voice to political subdivisions, as political subdivisions." 377 U.S. 581, 84 S.Ct. 1391.

But the Court warned:

" * * * Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body. This would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties. Such a result, we conclude, would be constitutionally impermissible. And careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." (Ibid.)

## I

■ Accepting, as we must, the decisions of the Supreme Court of the United States as ruling here, it is clear to us that the apportionment of the membership of the Arkansas Senate required by Amendment 45 is unconstitutional.

In considering the apportionment of the Senate it is noted that prior to the adoption of Amendment 45 the Arkansas Senate was, at least theoretically, apportioned on the basis of population with the qualifications that the senatorial districts should be "convenient," that they should be made up of contiguous territory, and that no county should be divided in the formation of a senatorial district.

In Butler v. Democratic State Committee, supra, the Court stated (p. 19 of 204 Ark., p. 496 of 160 S.W.2d) :

"* * * The purpose of [Amendment 23] was, of course, to secure equal and fair representation in the General Assembly upon the basis of proportionate population. It was recognized that a census of the state's population would be taken by the Federal Government every ten years, and it was contemplated and required that the adjustment or apportionment of representation should be based upon this census, and it was made the imperative duty of the Board of Apportionment to make apportionment of Representatives and Senators after the taking of each Federal Census. No discretion was vested in the Board as to whether this duty should be performed. * * *"

Again, in Smith v. Board of Apportionment, 219 Ark. 611, 243 S.W.2d 755, it was said (pp. 613–614 of 219 Ark., p. 756 of 243 S.W.2d) :

"The comprehensive measure affecting senatorial districts prior to 1937 was Act 129 of 1901, p. 201. * * * Section 2 of Art. 8 of the Constitution of 1874 was a mandate to the legislature to divide the state into convenient districts from time to time in such manner that the senate would be based upon the state's adult population, each senator as nearly as practical to represent an equal number male inhabitants. The districts were created, temporarily as it was then thought, until the population of counties as reflected by the Federal census of 1880 should become available as the basis of a better plan.

"Amendment No. 23 imposes upon the * * * Board the *imperative duty* of making assignments of senators to districts as created. Section 3 fixes membership of the senate at 35. Districts shall consist of contiguous territory, but a county must not be divided. With these limitations upon the one hand and affirmative mandates upon the other, the state is to be divided into convenient districts ' * * * in such manner that the Senate shall be based upon the inhabitants of the State, each Senator representing, as nearly as practicable, an equal number thereof; [and] each district shall have at least one Senator.' It will be noted that some of the language of the Amendment is so harmonious with certain expressions in § 2 of Art. 8 of the Constitution of 1874 as to suggest that the phrasing was copied."

By Act 129 of 1901 the State was divided into 34 senatorial districts. Under that Act the 10th District consisted of Pulaski and Perry Counties, and it was allotted two senators. All of the other districts had one each. As pointed out in Smith, supra, 219 Ark. at 614, 243 S.W.2d 755, the membership of the Senate was not reapportioned after 1901 until Amendment 23 became effective in 1937. In that year the districts were rearranged, and Pulaski County became a senatorial district to itself and was allotted two senators. No change was made in 1941. In 1951 the Supreme Court in both Smith and Pickens recognized that population changes throughout the State made it imperative that there be a change in the make-up of the Senate.

The Court divided the State into 26 senatorial districts.[4] Seven of those districts were allotted more than one Senator, and the remaining 19 districts were given one apiece. It was this apportionment which was frozen into the Constitution by Amendment 45, and is the one with which we are now concerned.

Using population alone as a basis for allocating Senate seats, and taking 1,-786,000 as a round population figure for Arkansas in 1960, the "natural" or "ideal" ratio for the allocation of such seats is one Senator for every 51,028 people. Five of the existing senatorial districts approach that ratio very closely; the remaining twenty-one depart from it rather widely, in instances extremely, in both directions.

The five districts coming closest to the ideal ratio are: The 13th District consisting of Union County alone; the population of Union County is 49,518, there is one senator, so the ratio is one to 49,-518. The 18th District consisting of Izard Independence, and Jackson Counties, having a population in 1960 of 49,657 and one Senator; the ratio is one to 49,657. The 24th District consisting of Craighead, Mississippi, and Poinsett Counties, having a population of 148,311 and three Senators; the ratio is one to 49,437. The 25th District, consisting of Cross, Crittenden, and St. Francis Counties, having a 1960 population of 100,418 and two Senators; the ratio is one to 50,209. The 26th District consisting of Monroe, Lee, Phillips, and Arkansas Counties, having a population of 105,680 and two Senators; the ratio is one to 52,840.

On the other hand, the 15th District consisting of Pulaski County alone with a 1960 population of 242,980 had only three Senators, the ratio being one to 80,993. The 4th District consists of Sebastian County alone and has been allotted one Senator. The 1960 population of Sebastian County, which includes the City of Fort Smith, was 66,685 so that the 4th District's ratio was one to 66,685. The ratio in the 2d District is one to 64,865. The 12th District, consisting of Ouachita and Columbia Counties, has a ratio of one to 58,041. The 11th District consisting of Garland, Saline, Hot Springs, and Clark Counties, had a 1960 population of 118,496 and two Senators; the ratio for that District is one to 59,-248. All of the districts mentioned in this paragraph are seriously under-represented in the Senate.

Other districts with one or two Senators are more or less overrepresented. This overrepresentation may be summarized as follows:

4. The Pickens apportionment appears in the table set out at pages 151–152 of 220 Ark., at pages 558–559 of 246 S.W.2d; see also the map of the State divided into senatorial districts which appears at page 153 of 220 Ark., at page 560 of 246 S.W.2d.

| District | Counties | Number Senators | Population | Ratio One to | Percent of Over-Representation Approximate |
|----------|----------|:---:|:---:|:---:|:---:|
| 1st | Benton | | | | |
| | Carroll | 1 | 47,556 | 47,556 | 6 |
| 3rd | Crawford | | | | |
| | Franklin | | | | |
| | Johnson | 1 | 43,952 | 43,952 | 14 |
| 5th | Logan | | | | |
| | Scott | | | | |
| | Yell | | | | |
| | Montgomery | 1 | 40,564 | 40,564 | 20 |
| 6th | Polk | | | | |
| | Howard | | | | |
| | Sevier | | | | |
| | Little River | 1 | 42,226 | 42,226 | 17 |
| 7th | Pike | | | | |
| | Hempstead | | | | |
| | Nevada | 1 | 38,225 | 38,225 | 25 |
| 8th | Miller | | | | |
| | LaFayette | 1 | 42,716 | 42,716 | 16 |
| 9th | Boone | | | | |
| | Marion | | | | |
| | Baxter | | | | |
| | Newton | | | | |
| | Searcy | 1 | 46,187 | 46,187 | 9 |
| 10th | Pope | | | | |
| | Conway | | | | |
| | Perry | 1 | 41,534 | 41,534 | 18 |
| 14th | Stone | | | | |
| | Van Buren | | | | |
| | Cleburne | | | | |
| | Faulkner | 1 | 46,884 | 46,884 | 8 |
| 16th | Grant | | | | |
| | Dallas | | | | |
| | Bradley | | | | |
| | Cleveland | | | | |
| | Calhoun | 1 | 45,780 | 45,780 | 10 |
| 17th | Fulton | | | | |
| | Randolph | | | | |
| | Sharp | | | | |
| | Lawrence | 1 | 42,763 | 42,763 | 16 |
| 19th | White | | | | |
| | Lonoke | | | | |
| | Woodruff | | | | |
| | Prairie | 2 | 81,765 | 40,887 | 19 |
| 20th | Jefferson | | | | |
| | Lincoln | 2 | 95,820 | 47,910 | 6 |
| 21st | Drew | | | | |
| | Desha | 1 | 35,983 | 35,983 | 29 |
| 22d | Ashley | | | | |
| | Chicot | 1 | 43,210 | 43,210 | 15 |
| 23rd | Clay | | | | |
| | Greene | 1 | 46,456 | 46,456 | 9 |

From the figures that have been given it is apparent that the five districts in which the ratios most closely approach the ideal ratio contain 453,584 persons, or approximately 25 percent of the population of the State, and have allotted to them nine of the 35 Senate seats.[5] The under-represented districts have a population of 551,067 or about 31 percent of the total State population, and control eight seats. And the over-represented districts containing 781,721 persons or about 44 percent of the population control 18 of the 35 Senate seats. Thus, a minority of the people controls the Senate.

The disparities which existed in the Senate apportionment in 1961 were greater than they were in 1951, and the disparities which exist today are probably more glaring than those which existed four years ago because the population shift to the urban areas apparently is continuing. So long as Amendment 45 remains in force those disparities cannot be corrected no matter how much the Board may be inclined to correct them.

In the light of the requirement of the Apportionment Cases that State senatorial districts be so constructed that each Senator represents, as far as practicable, the same number of people, the apportionment prescribed by section 3 of Amendment 45 simply cannot stand.

II

Nor do we think that the apportionment of the Arkansas House of Representatives meets the constitutional standard laid down by the Supreme Court of the United States.

In 1930 the population of Arkansas in round figures was 1,854,000; in 1940 it was 1,949,000. In the decade between 1940 and 1950 the population declined to 1,910,000, and, as indicated, by 1960 it was down to 1,786,000.

Acting pursuant to Amendment 23 the Board apportioned the House in 1937 on the basis of the 1930 census, and kept the same apportionment in effect following the census of 1940. The Board, of course, allotted one House seat to each of the 75 counties. It then apportioned the 25 free seats as follows: Pulaski County, six; Mississippi, Sebastian, Jefferson, and Union Counties, two each; Craighead, Phillips, Crittenden, Garland, Washington, White, Benton, St. Francis, Hempstead, Miller, and Lonoke Counties, one each.

The Board's 1937 apportionment does not appear to have been challenged in the Supreme Court, but there was such a challenge with respect to the 1941 apportionment. Shaw, Autry and Shofner v. Adkins, Governor, supra. The Supreme Court of Arkansas after giving careful consideration to the problem revised the Board's action so as to give Mississippi and Poinsett Counties an additional seat each and so as to take away a seat each from Lonoke and Union Counties.

In 1951 the Board reapportioned the House and made certain changes in the allocation of the free seats.[6] The 1961 apportionment of the House by the Board, which apportionment was revised by the Court in Stevens, supra, was very little different from the 1951 apportionment notwithstanding Arkansas' loss of population and the shift of population to the more populous counties.

The natural ratio of representation in the House, based on the 1960 census, is one representative to every 17,860 people. The actual ratio in what we have called the "apportioned counties" is one Representative to every 22,207 people, about 24 percent above the ideal; and the actual ratio in the unapportioned counties is one Representative for every 15,311 people or about 14 percent below the ideal. In other words, the apportioned counties, particularly Pulaski, are seriously under represented, and the less populous unap-

---

5. Some of the districts which most closely approach the ideal ratio are in fact over represented to some extent and others are under represented to some extent.

6. The Board's 1951 apportionment is set forth in the table appearing in Stevens v. Faubus, supra, 234 Ark. at 830, 354 S.W.2d 707.

portioned counties are substantially over represented. The apportioned counties, which have a combined population of 821,663 or about 46 percent of the State's total, control 37 of the 100 House seats, and the unapportioned counties, having about 54 percent of the population, control 63 of those seats.

The county-to-county disparity in ratio is glaring indeed as is evident from even a casual glance at a list of the 75 counties with their 1960 populations. A few examples will suffice. In Pulaski County the ratio is one Representative to 22,089 people, whereas in Perry County, the smallest in the State from the standpoint of population, the ratio is one to 4,927. In Baxter County the ratio is one to 9,943; in Howard County it is one to 10,878; in Marion County it is one to 6,041; in Mississippi County, which has two Representatives, the ratio is one to 37,087; in Searcy County it is one to 8,124; and in Sebastian County it is one to 33,343.

While the House membership, unlike that of the Senate, is flexible to some extent, we are convinced that the present guarantee of one Representative each to the smaller counties without regard to population, and the 100 member limitation on the size of the House effectively prevent equality of representation on the basis of population.

### III

There remains for consideration the question of whether we should undertake to grant any mandatory relief at this time and, if so, the nature and extent of the relief to be granted. In approaching this question it is well to keep in mind that the only defendants before us are the members of the Board of Apportionment; no other State agency is before the Court.

Our decision that Amendment 45's apportionment of the membership of the Legislature is unconstitutional immediately raises serious questions of State constitutional law which, if answered ultimately, must be answered by the Supreme Court of Arkansas. While the members of this Court may think that they know the answers to those questions, no opinion which we might express would be more than a forecast as to what the Supreme Court of Arkansas eventually might hold. Some or perhaps all of the answers may be produced in connection with the Kinney litigation in the Chancery Court which has been mentioned.

In view of the situation just outlined, we admit the temptation to go no further at this time than to declare the existing apportionment scheme unconstitutional, leaving it to the State, including the Judicial Branch of its Government, to bring about a valid reapportionment as best it can.

We do not think, however, that in a case of this importance we should stay our hand, particularly in view of the fact that whatever reapportionment there is to be should take place and be tested in time to be the basis for the 1966 general election which will take place in November of that year. Cf. Maryland Committee v. Tawes, supra, 377 U.S. at 676, 84 S.Ct. 1429.

The Board of Apportionment is before the Court, and whether rightly or wrongly the Board is taking the position that it has or probably has the power to make a valid reapportionment. Since the Board takes this position, we think that it should be directed, and it will be directed, to come forth with a valid scheme of apportionment not later than June 15 of the current year. If it develops ultimately that the Board has no such power as a matter of State law, the Court can then take such steps as may seem necessary or appropriate in the circumstances, including the addition of other parties defendant if such a course seems necessary or desirable.

The Court is aware that the Legislature is now in session, and the Court is aware also that the possibility of that body taking some action itself in the field of reapportionment is being discussed rather widely. Our directive to the Board to proceed to make a reapportionment by June 15 is certainly without

prejudice to the right of the Legislature to take such action in the field as it may deem to be proper or judicious.

After all, this Court is not directly concerned at this time with what body brings about a valid reapportionment, nor is it concerned with what particular scheme may be adopted ultimately provided that the chosen scheme meets the constitutional requirement laid down by the Reapportionment Cases.

An appropriate decree will be entered. Jurisdiction of the case will be retained for such further proceedings herein as may be justified or required.