STEVENS *v.* FAUBUS, GOVERNOR.

5-2409 and 5-2431                                          354 S. W. 2d 707

Opinion delivered March 12, 1962.

*Carlton Currie* and *Moore, Chowning, Mitchell, Hamilton & Burrow,* by *W. S. Mitchell,* for petitioners.

*Frank Holt,* Attorney General by *Sam H. Boyce,* Asst. Attorney General; *William J. Smith, Willis B. Smith, John O. Moore, Hayes C. McClerkin, Maddox, Greer, Maddox & Collier, Fred H. Stafford, J. E. Lightle, J. Bruce Streett* and *Charles E. Plunkett,* for respondents and intervenors.

NEILL BOHLINGER, Associate Justice. These are two original actions filed by the petitioners, citizens of Pulaski County and of Jefferson County, to review the 1961 reapportionment of the House of Representatives. The respondents are the members of the Board of Apportionment created by Amendment 23 to the state constitution. Citizens of Miller, Ouachita, Poinsett, and White Counties have intervened and joined in the defense of the Board's apportionment.

Section 2 of Amendment 23, which was re-enacted by Amendment 45, provides that the House shall consist of 100 members, that each county shall have at least one representative, and that the remaining members "shall be equally distributed (as nearly as practicable) among the more populous counties of the State," in accordance with a ratio to be determined by population. Section 4 of Amendment 45 requires the Board of Apportionment to reapportion the House after each federal census. Section 5 provides for original proceedings like these, in which the court may revise any arbitrary action or abuse of discretion on the part of the Board.

Each of the seventy-five counties is entitled to one representative. The problem is that of allocating the remaining twenty-five seats among the more populous counties in the fairest possible manner.

The entire subject was carefully considered in *Shaw* v. *Adkins,* 202 Ark. 856, 153 S. W. 2d 415, which effectively settles every question presented by the cases at bar. As that opinion indicates, the theories of apportionment have been thoroughly analyzed with reference to the similar problem of allocating the seats in Congress after each census. In the *Shaw* opinion the late Chief Justice GRIFFIN SMITH, speaking for a unanimous court, discussed in detail the five recognized mathematical formulas for apportionment. The five methods are called that of smallest divisors, equal proportions, major fractions, harmonic mean, and greatest divisors. In the earlier case we quoted with approval this language from a treatise on the problem of apportionment:

"It is generally agreed that Congress, consciously or unconsciously, has had two principal aims in view: First, to equalize the 'congressional districts' among the several states; and secondly, to equalize the 'individual shares' among the several states. What the modern mathematical theory has done is to establish clearly the relations between these two aims and give the possible methods listed above.

The mathematical facts are as follows: The method of smallest divisors and the method of greatest divisors fail on both these aims; the method of major fractions fails on the first aim; the method of harmonic mean fails on the second aim; the method of equal proportions achieves both aims.

In view of these facts, the method of equal proportions was approved by two scientific bodies: The Advisory Committee to the Director of the Census, in 1921; and the National Academy of Sciences, in 1929."

In the *Shaw* case, after considering all five methods, the court approved the method of equal proportions as the fairest known formula. We accordingly revised the 1941 apportionment to conform to the results achieved by the method of equal proportions. This precedent was followed by the Board as a matter of course after the 1950 census. In that instance the Board applied the rule of equal proportions after one of its members had explained that the apportionment of the House "presents no problem whatever" in view of the court's decision in *Shaw* v. *Adkins*.

Between 1950 and 1960 a few counties showed an increase in population, but the State's total population declined. In the reapportionment now under review the Board made only one change: One seat was taken from Mississippi County and was given to Miller County. In all other respects the Board continued in force the apportionment adopted in 1951.

When the facts are studied the new apportionment appears to be domonstrably arbitrary. For example, during the decade in question Pulaski County *gained* 46,295 people, but the Board gave this county no additional representation. By contrast, Miller County *lost* 928 people, but the Board nevertheless gave it an additional representative. It is clear that such inconsistencies as this one could be justified if, but only if, the Board was attempting to correct pre-existing inequalities in the 1951 apportionment. No such intention is suggested by the Board's record of its proceedings, nor do the facts support that conclusion.

In fixing the 1961 apportionment the Board declared that it had chosen the method of smallest divisors because that method would "cause the fewest dislocations in the present representation of the more populous counties." That this method does cause the fewest changes is confirmed by the following tabulation, which the parties concede to be a correct summary of the 1951 apportionment of the 25 additional seats and of the results to be achieved in 1961 by each of the five recognized methods of apportionment:

## RESULTS OBTAINED BY DIFFERENT METHODS

| County | 1960 Census | Present Apportionment | Smallest Divisors | Equal Proportions | Major Fractions | Harmonic Mean | Greatest Divisors |
|---|---|---|---|---|---|---|---|
| Pulaski | 242,980 | 7 | 7 | 10 | 10 | 9 | 12 |
| Jefferson | 81,373 | 2 | 2 | 3 | 3 | 2 | 3 |
| Mississippi | 70,174 | 3 | 2 | 2 | 2 | 2 | 2 |
| Sebastian | 66,685 | 2 | 2 | 2 | 2 | 2 | 2 |
| Washington | 55,797 | 1 | 1 | 1 | 2 | 1 | 1 |
| Union | 49,518 | 1 | 1 | 1 | 1 | 1 | 1 |
| Crittenden | 47,564 | 1 | 1 | 1 | 1 | 1 | 1 |
| Craighead | 47,303 | 1 | 1 | 1 | 1 | 1 | 1 |
| Garland | 46,697 | 1 | 1 | 1 | 1 | 1 | 1 |
| Phillips | 43,997 | 1 | 1 | 1 | 1 | 1 | 1 |
| Benton | 36,272 | 1 | 1 | 1 | 1 | 1 | 0 |
| St. Francis | 33,303 | 1 | 1 | 1 | 0 | 1 | 0 |
| White | 32,745 | 1 | 1 | 0 | 0 | 1 | 0 |
| Miller | 31,686 | 0 | 1 | 0 | 0 | 1 | 0 |
| Ouachita | 31,641 | 1 | 1 | 0 | 0 | 0 | 0 |
| Poinsett | 30,834 | 1 | 1 | 0 | 0 | 0 | 0 |
| | | 25 | 25 | 25 | 25 | 25 | 25 |

The Board was unquestionably mistaken in seeking that method of apportionment that would cause the least change in the existing representation. That point of view is contrary to the clear intention of the people in the adoption of Amendment 23. It was because the allocation had not been changed for many years and had become inequitable that the voters declared in Amendment 23 that the apportionment must be adjusted every ten years. There is implicit in Amendment 23 the conviction that a fair distribution of the people's representatives in the House is an essential element of our system of state government. The Board of Apportionment was therefore created for the purpose of making changes, not for

that of preserving the status quo. Hence the Board misconceived its own reason for existence when it consciously looked for a way of making as few changes as possible.

The Board's selection of the method of smallest divisors cannot be reconciled with the decision in *Shaw* v. *Adkins*. There we compared the five recognized methods of apportionment and concluded that the rule of equal proportions was the most just and the most equitable of all the methods. Every argument that is now made in favor of the Board's choice of the method of smallest divisors could have been made in favor of that same method in the *Shaw* case. It would be impossible for us to approve the Board's action in this instance without overruling the decision in the *Shaw* case.

Counsel for the appellees call our attention to one sentence in the earlier opinion in which we disclaimed any purpose to assert ''that all possible methods of computation have been tested, or to say that in certain circumstances relating to population gains or losses a more equitable apportionment could not be made.'' That observation merely conceded the possibility that another formula might someday be discovered that would be superior to the method of equal proportions. The rule of smallest divisors obviously does not fall within that category, for it was known, considered, and rejected as inferior when the *Shaw* case was decided.

In demonstrating the mathematical superiority of the rule of equal proportions the court used this illustration in the *Shaw* opinion:

''Lonoke County has a population of 29,802 and has two house members. Theoretically each represents a population of 14,901. Mississippi County has a population of 80,217 and has three members. Each, therefore, represents a population of 26,739. In theory each Mississippi County member represents 11,838 more constituents than does each of Lonoke's members, the differential being 79.4 per cent. If one member should be

taken from Lonoke County and given to Mississippi [as required by the method of equal proportions], each of Mississippi's four members would represent 20,054 persons and Lonoke's one remaining member would represent 29,802, an absolute difference of 9,748, or 48.6 per cent, against Lonoke. The disparity difference against Mississippi County at present is much larger than the disparity against Lonoke County if the latter is reduced to one member.''

In this way the court demonstrated that the method of equal proportions effected more nearly complete abstract justice than did the apportionment adopted by the Board.

Similar calculations can readily be made in the present instance. Under the rule of equal proportions Pulaski County, with a population of 242,980, has eleven representatives, so that each theoretically represents 22,089 people. Poinsett County has a single representative for its 30,834 people. The absolute difference is 8,745, or a disparity of 39.5 per cent against Poinsett County. If one representative is taken from Pulaski and given to Poinsett the disparity is increased to 57.5 per cent against Pulaski, so that the superiority of the method of equal proportions is demonstrated. In fact, if Pulaski is reduced to eight members, which was the result of the Board's action, the disparity jumps to 97 per cent in favor of Poinsett. (It may be observed that Poinsett County is hardly in a position to oppose the method of equal proportions. As a petitioner in the *Shaw* case Poinsett County gained an additional representative by reason of the court's adoption of the rule of equal proportions. Having enjoyed the benefit of the rule for twenty years the county cannot very well insist that some other method should be adopted now that its population has declined while that of other counties has increased.)

In the *Shaw* case it was considered significant that the method of equal proportions and that of major fractions, the only other method to have been approved by statute, gave the same results. That is almost true in

this instance as well, the single difference being that the method of major fractions would take one seat from St. Francis County and give it to Washington County. The system of comparison used in the *Shaw* case shows that in its result the method of major fractions produces a disparity against St. Francis of 79 per cent, while the method of equal proportions leads to a disparity against Washington County of only 68.9 per cent. Once more the latter method is shown to be preferable.

In conclusion, we find it impossible to approve an apportionment which holds that one county, having gained 46,295 in population, is entitled to no additional representation, while another county, having lost 928 in population, is to be rewarded with an added seat in the House. We adhere to the method of equal proportions because (a) Amendment 23 requires that the membership of the House be reapportioned according to population after each federal census, (b) the method of apportionment by equal proportions can be demonstrated to be the fairest of all the known methods, (c) that method has the approval of Congress and of scientific analysis, (d) that method was adopted by this court in *Shaw* v. *Adkins*, which is a controlling precedent, (e) it was adopted and applied by the Board of Apportionment in 1951, and (f) after the court had construed the language of Amendment 23 in the *Shaw* case the people re-enacted the pertinent language in exactly the same form in Amendment 45. No valid argument to the contrary has been presented in these cases.

It is to be regretted that no plan has been or can ever be formulated in a situation like this that will be so mathematically balanced that no disparity will exist. But the method of equal proportion is the fairest that has yet been devised to meet the situation that confronts us here. In an effort to follow the mandate of the people, it is our duty to accept the best fixed formula proposed, be its defects what they may, rather than to leave a situation with the potentialities of the present one relying upon a rule-of-thumb sense of equity that may find expression

in a Board of Apportionment in the years that follow when we know not the membership that will compose those future boards. The situation demands a clear and precise procedure as an alternative.

The Board's apportionment will be revised to conform to the results achieved by the application of the rule of equal proportions. By this method Pulaski County, having gained 46,295 in population, is entitled to three additional representatives, and Jefferson County, having gained 5,298 in population, is entitled to one additional representative. White, Mississippi, Ouachita, and Poinsett Counties lose one seat each from the present apportionment. It is so ordered.

GEORGE ROSE SMITH, J., concurs.

WARD and JOHNSON, JJ., dissent.

GEORGE ROSE SMITH, J., concurring. I concur only to point out that the Quotient Assignment Table contained in one of the dissenting opinions is not a new method of apportionment. It is simply the method of smallest divisors, which was considered and rejected in the *Shaw* case.

The Quotient Assignment Table is arrived at by dividing the population of the larger counties first by one, then by two, then by three, and so on. It will be seen by reference to the table constituting Footnote 12 to the *Shaw* opinion that this is the exact formula for apportionment by the method known as that of the smallest divisors. The only difference, one purely of form, is that in the *Shaw* table the populations are multiplied by the reciprocals (as fully explained in Footnote 7 of the *Shaw* opinion) of the numbers that would be used as divisors. For instance, the *Shaw* table first multiplies by .5, which of course is the same thing as dividing by two. Thus the two methods are actually identical.

PAUL WARD, Associate Justice, dissenting. For the reasons hereafter set forth and explained, I cannot agree with the majority opinion.

1. I do not feel bound, as the majority seems to be, by the opinion in the *Shaw* case. My reasons for this are found in the opinion itself, as a few references will demonstrate. (a) The opinion mentions five separate formulas by which an apportionment can be made and then quotes (from Huntington) as follows:

" 'To meet realistically the actual situation in Congress when an apportionment bill is up for debate, the *emphasis is shifted from the process of computation to the test of fairness which the final result would satisfy. The fairness of the final result, not the technical process of achieving this result, is regarded as the important thing.*' " (Emphasis added.)

(b) Again, the opinion states:

"It is not our purpose to assert that all possible methods of computation have been tested, or to say that in certain circumstances relating to population gains or losses a more equitable apportionment could not be made. We have given earnest consideration to discussions by authorities who have been classed as experts. That the method of major fractions and equal proportions give uniform results when applied to Arkansas is significant."

(c) A careful study of the opinion convinces me it merely means to hold that the "equal proportions" formula reached the correct result when applied to the distribution of population in Arkansas *at that particular time,* and that it was adopting that particular formula to reach a correct decision *in that particular case.* That conclusion comports completely with the eminent authority quoted in the opinion (set out above) to the effect that *the final result and not the process by which it is reached is the important thing.*

2. The *Shaw* opinion recognizes five expert formulas for apportioning purposes. It is conceded they all do not reach the same results when applied to the same essential figures. It must therefore be conceded they are not all infallible. It is also conceded that absolute equality cannot be achieved. That is why Article 8, Section 2 of the Constitution directs the Board of Apportionment to distribute the members equally "as nearly as practicable".

3. Not only would I affirm the allotment made by the Board because I cannot say it abused its discretion, but, in my judgment, the attached exhibit (for lack of a better name, called "Quotient Assignment Table") proves the Board's allotment meets the "test of fairness". A brief explanation of the Table will help to understand how the results reached therein were attained.

## QUOTIENT ASSIGNMENT TABLE

| Line | County | 1960 Pop. | Const. AL | Quotient | 2nd AL | Quotient | 3rd AL | Quotient | 4th AL | Quotient | 5th AL | Quotient | 6th AL | Quotient | 7th AL | Quotient | 8th AL | Total | This method | Board Opinion |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Pulaski | 242,980 | 1 | A 121,490 | | B 80,993 | | D 60,745 | | G 48,596 | | J 40,497 | | P 34,711 | | S 30,373 | | 7 | 8 | 11 |
| 2 | Jefferson | 81,373 | 1 | C 40,687 | | O 27,124 | | | | | | | | | | | | 2 | 3 | 4 |
| 3 | Mississippi | 70,174 | 1 | E 35,087 | | R 23,391 | | | | | | | | | | | | 2 | 3 | 4 |
| 4 | Sebastian | 66,685 | 1 | F 33,342 | | T 22,228 | | | | | | | | | | | | 2 | 3 | 3 |
| 5 | Washington | 55,797 | 1 | H 27,898 | | | | | | | | | | | | | | 1 | 2 | 2 |
| 6 | Union | 49,518 | 1 | I 24,759 | | | | | | | | | | | | | | 1 | 2 | 2 |
| 7 | Crittenden | 47,564 | 1 | K 23,782 | | | | | | | | | | | | | | 1 | 2 | 2 |
| 8 | Craighead | 47,303 | 1 | L 23,651 | | | | | | | | | | | | | | 1 | 2 | 2 |
| 9 | Garland | 46,697 | 1 | M 23,348 | | | | | | | | | | | | | | 1 | 2 | 2 |
| 10 | Phillips | 43,997 | 1 | N 21,998 | | | | | | | | | | | | | | 1 | 2 | 2 |
| 11 | Benton | 36,272 | 1 | Q 18,136 | | | | | | | | | | | | | | 1 | 2 | 2 |
| 12 | St. Francis | 33,303 | 1 | U 16,651 | | | | | | | | | | | | | | 1 | 2 | 1 |
| 13 | White | 32,795 | 1 | V 16,397 | | | | | | | | | | | | | | 1 | 2 | 1 |
| 14 | Miller | 31,686 | 1 | W 15,843 | | | | | | | | | | | | | | 1 | 2 | 1 |
| 15 | Ouachita | 31,641 | 1 | X 15,820 | | | | | | | | | | | | | | 1 | 2 | 1 |
| 16 | Poinsett | 30,832 | 1 | Y 15,416 | | | | | | | | | | | | | | 1 | 2 | 1 |
| | Total | | 16 | | | | | | | | | | | | | | | 25 | 41 | 41 |

It is agreed by all that 25 members of the House are to be divided among the 16 counties shown in the table. The 16 counties have been selected because no one contends any other county (all smaller than Poinsett) is entitled to more than the one representative which is assigned to it by the Constitution.

I have chosen, for clarity, to have each letter of the alphabet (except Z) represent one of the 25 House members to be allotted, and the process was to allot one member at a time with A representing the first allotment, B the second, and so on through Y. Column 3 (on the table) shows the constitutional allotment of one member to each of the 16 counties. The first member, represented by A (shown in column 4), will of course go to Pulaski County since its population exceeds that of any other county. This results in Pulaski County having 2 members, and that in turn results (242,980 divided by 2) in each member representing 121,490 people—shown in column 5; Member B (column 6) will automatically go to Pulaski County for the reason previously stated, and this means (242,980 divided by 3, the number of members) that each member will represent 80,993 (column 7); Member C (column 8) must go to Jefferson County because it has 81,373 population (and 1 member) and is the only county with a population exceeding Pulaski County (where 1 member represents 80,993). The other members (D to Y) are alloted (as shown by the table) one at a time to the counties having the largest population being represented by a single member of the House. The result is that the total number of members allotted to each of the 16 counties (column 20) is exactly the same as the number allotted by the Board (column 21). Whether the above method is called the "smallest divisors" method or is called by any other name, it is mathematically sound, it is practicable, it proves itself step-by-step, and it reaches a fair result. Moreover, it will reach the same fair result in every instance regardless of the number of representatives, the number of counties, the increase or decrease in population, or the shifts in population among the counties.

It seems axiomatic that the only fair and logical way to determine the number of people represented by a single member of the House in any given county is to divide the number of people by the number of members allotted to that county. That is the basis of the method I have chosen, but it is not the basis of the method chosen by the majority. The difference between the results in the two methods can be demonstrated by using Pulaski County with a population of 242,980, dividing by 2, 3, and 4 members:

|  | 2 | 3 | 4 |
|---|---|---|---|
| This method | 121,490 | 80,993 | 60,290 |
| Majority Method | 170,086 | 99,196 | 70,143 |

The same disparity holds true for all 16 affected counties.

I cannot conscientiously say, therefore, that the Board abused its discretion in making the allotments.

Jim Johnson, Associate Justice, dissenting. The majority opinion completely ignores specific provisions of our State Constitution and also the history of apportionment in Arkansas. I am convinced that in so doing the opinion is erroneous. Having this view, I am dissenting and setting forth herein the grounds on which I rely.

Amendment No. 23 to our State Constitution, adopted in the General Election of 1936, created for the first time "The Board of Apportionment." That Amendment authorized the Board to fix thirty-five senatorial districts and to divide one hundred representatives among the seventy-five counties. The Amendment gave certain limited powers to this Court. First, it empowered this Court to compel (by mandamus) the Board to perform its duties. Second, it authorized this Court "to revise any arbitrary action of or abuse of discretion by the Board in making any such apportionment."

Amendment No. 23 was the source of litigation in the case of *Shaw, Autry & Shofner* v. *Atkins, Governor,* 202 Ark. 856, 153 S. W. 2d 415, in which this Court stated:

"It is not our purpose to assert that all possible methods of computation have been tested, or to say that in certain circumstances related to population gains or losses a more equitable apportionment could not be made."

Following the *Shaw* case (in which this Court so clearly recognized the powers of The Board of Apportionment to use various methods of apportionment) the voters again amended our State Constitution by the adoption in the 1956 general election of Amendment No. 45. This Amendment made two changes and only two. First, it divested The Board of Apportionment of the power to apportion senators. Second, it froze permanently the senatorial districts then existing. No additional powers were given nor taken from The Board or this Court.

This review brings us to the case now before the Court wherein the majority has concluded that only one method of apportionment may be used by The Board; that method being the Method of Equal Proportions and the majority relies upon the Shaw case for its authority. Actually, a study of the Shaw case reveals that three out of five modern accepted mathematical methods of apportionment when applied to the Arkansas census considered in the *Shaw* case produced the same results.

The table showing these mathematical computations is contained in the *Shaw* opinion. Methods known as the Method of Harmonic Mean, the Method of Major Fractions and the Method of Equal Proportions, all produced the same results. The majority view is that the *Shaw* case approved only one method (the Method of Equal Proportions) and held that only that method could be used by The Board. In my opinion, the *Shaw* case says no such thing and cannot be reasonably construed to lay down such an arbitrary and rigid formula for apportioning members of the House of Representatives.

The majority opinion robs The Board of Apportionment of its discretionary powers and in effect con-

stitutes this Court a super Board of Apportionment, all of which I feel is contrary to the Constitution and contrary to the will and intent of the voters of Arkansas when they adopted Amendment No. 45.

I refer again to the above statement taken from the *Shaw* case in which this Court clearly and definitely recognized the discretionary powers of The Board and The Board's right to use various methods of apportionment, depending on the circumstances relating to population gains or losses.

Acting to carry out their duties as members of The Board of Apportionment, Governor Orval E. Faubus, Secretary of State Nancy Hall and Attorney General Frank Holt took valuable time from the heavy responsibilities of their offices (especially at a time when the General Assembly was in session) for the purpose of studying all recognized and accepted methods of apportionment as applied to the official census of Arkansas for 1960. They found that all five such methods produced different results, whereas three out of the five had methods producing the same result when applied to the census of 1940. These three Constitutional Officers of our State adopted the method known as the Method of Smallest Divisors and they performed their duties by filing their report before February 1, 1961, as directed by the Constitution.

In order to revise the report of The Board, the majority holds that these three officials were arbitrary in their action. This opinion I cannot share because their very action and devotion to duty, in my opinion, demonstrates beyond any question that these officials were not arbitrary in making the apportionment set out in their report. The charge of arbitrary action is serious and is one in which I cannot and will not join when, as in this case, there is no evidence to sustain such a charge.

I want to emphasize that we are not called upon to decide whether The Board's report is correct or whether we would have reached a different conclusion if we had constituted The Board of Apportionment in the first

instance. The people (through Amendments 23 and 45) reposed the duty to apportion in The Board of Apportionment and not in this Court. This is the duty the majority opinion usurps. In the case of *Hall* v. *Bledsoe,* 126 Ark. 125, 189 S. W. 1041, this Court said:

"We are not called on to decide primarily whether or not the decision of The Board was correct. The lawmakers have placed that authority in The Board of Control, and it would be clearly an encroachment by the Courts beyond the authority of another Department of Government to undertake to substitute the Judgment of the Judges for that of the members of the tribunal vested with authority to manage the Institutions of the State."

Also in the case of *Department of Public Utilities* v. *Ark. La. Gas Co.,* 200 Ark. 983, 142 S. W. 2d 213, we said:

". . . if the Department's order is supported by substantial evidence, free from fraud, and not arbitrary, it is the duty of the Courts to permit it to stand, even though they might disagree with the wisdom of the order. In such a case our Judgment will not be substituted for that of the Department."

Many times this Court has held that the General Assembly, acting within constitutional limitations, is the sole judge of the wisdom, expediency and necessity of legislation. *Williams* v. *Parnell,* 185 Ark. 1105, 51 S. W. 2d 863; *Gentry* v. *Harrison,* 194 Ark. 916, 110 S. W. 2d 497.

Arbitrary is a strong word and it has been defined by the Supreme Court of the United States in *United States of America, Petitioner,* v. *Carmack,* 329 U. S. 230, 67 S. Ct. 252, 91 L. Ed. 209 as follows:

" 'Arbitrary' is defined by Funk & Wagnalls New Standard Dictionary of the English Language (1944), as '1. . . .; without adequate determining principle; . . .' and by Webster's New International Dictionary, 2d ed. (1945), as '2. Fixed or arrived at through an exercise of will or by caprice, without consideration or

adjustment with reference to principles, circumstances, or significance . . . decisive but unreasoned; . . .'

" 'Capricious' is defined by Webster's New International Dictionary, 2d ed. (1945), as '2. . . .; apt to change suddenly; freakish; whimsical; humorsome.' Cf. Fox Film Corp. v. Trunbull (DC) 7 F. 2d 715, 727; Puget Sound Power & L. Co. v. Public Utility Dist. (CCA 9th Wash.) 123 F. 2d 286, 290, writ of certiorari denied in 315 US 814, 86 L. ed. 1212, 62 S. ct. 798; United States v. Eighty Acres of Land (DC Ill.) 26 F. Supp. 315, 319.

"See also, United States v. Certain Parcels of Land (DC Md) 30 F. Supp. 372, 379; United States v. Parcel of Land (DC Del.) 32 F. Supp. 718, 721."

How can the majority say that the Board has acted arbitrarily when The Board has selected one of the five modern accepted mathematical formulas used in apportionment. I do not think that The Board is limited to these five formulas and I base my opinion on the fact that one must concede that a time could come when under any or all of the five presently accepted and recognized mathematical formulas used in apportionment one county could claim all twenty-five of the extra members of the House of Representatives. Such a situation cannot be contemplated by Amendment No. 45 because it uses the plural "more populous counties". To continue with the discussion of arbitrary action, courts generally hold that administrative agencies cannot be found guilty of such action where there is room for two opinions and action is exercised honestly and upon due consideration. *Smith* v. *Hollenbeck,* 48 Wash. 2d 461, 294 Pac. 2d 921, *Lillions* v. *Gibbs,* 47 Wash. 2d 629, 289 Pac. 2d 203.

In the case before this Court, there is not only room for two opinions, there is room for a minimum of five opinions because there are five accepted and recognized mathematical methods of apportionment, and, in my opinion, I would add at least one other method because Amendment No. 45 to our State Constitution does not limit the Board to these five methods.

As I have already stated with citations above, this Court has refused to substitute its judgment for that of State Boards or Commissions and it has refused to strike down legislation merely because it did not agree with the wisdom of the General Assembly. I contend that this Court should refuse to revise the report of The Board of Apportionment because in so doing the Court substitutes its judgment for The Board's judgment. Such action by the Court is wrong and amounts to the usurpation by the Court of powers vested in the Governor, the Secretary of State and the Attorney General by the people of Arkansas.

Whether I agree or disagree with the result set forth in The Board's report is of no consequence because I have no right to substitute my judgment for the Board's judgment.

The important issue and the only issue in this case is whether Orval E. Faubus, Nancy Hall and Frank Holt took arbitrary action or abused their discretion and I emphatically and without equivocation say that they did not.

In *McCaa Chevrolet Company* v. *Bounds, Administrator*, 207 Ark. 1043, 183 S. W. 2d 932, this Court said:

". . . A court is not at liberty to read something into the law that was not put therein by its framers, even if such a course may seem necessary in order to prevent an apparently unjust result in the case being considered."

This same rule would apply in construing the Constitution. Even if the majority disagrees with the result reached by The Board of Apportionment, the majority still has no right to read something into Amendment No. 45 that is not there. The majority, in effect, tells the Governor, the Secretary of State and the Attorney General in future apportionment cases that their function is the performance of a mere ministerial duty of applying a mathematical formula and that they have no discretion and cannot exercise any judgment in formulating a

report on apportionment which they deem to be just and fair and in the best interests of the people of Arkansas. These are three public officials who must answer to the people of Arkansas at the polls each two years. I do not believe and cannot understand why it would be necessary to take the time of the Governor, the Secretary of State and the Attorney General to consider and pass their judgment upon a matter if it is one in which only one conclusion can be reached and that conclusion is the result of a mathematical formula. Such a procedure and requirement would be ridiculous and I do not believe that the people of Arkansas intended that this Court would have the power to bring about such a situation when the people enacted Amendments Nos. 23 and 25 to our Constitution.

I would affirm the report of The Board of Apportionment and would commend the three state officials involved for their prompt and considerate discharge of the duties imposed upon them by these provisions of the Constitution of our State.

In re Briefing of Criminal Case:

## Per Curiam

For many years it has been the rule of this Court that in felony cases we will examine all alleged errors in the Motion for a New Trial, regardless of whether all of the alleged errors are argued by appellant on appeal. *Martin* v. *State,* 206 Ark. 151, 174 S. W. 2d 242, *Boyd* v. *State,* 215 Ark. 156, 219 S. W. 2d 623. The Attorney General has, therefore, felt it his duty to brief all assignments of error in the Motion for a New Trial, notwithstanding, it was obvious that many such alleged errors had no merit.

This procedure has placed an undue burden on the Attorney General and it is not required in a fair administration of the criminal laws. Therefore, in the future, in a non-capital felony case, the Attorney General will be required to brief only those points argued by appellant and such other points as may appear to the Attorney General to have merit. If no brief is filed on behalf of the appellant in a non-capital felony case, the Attorney General will brief those assignments of error in the Motion for a New Trial that may appear to be beneficial to the appellant. In all capital cases the Attorney General will brief all issues raised by an objection made by the defendant.