Raymond Simon, Director Arkansas Department of Education #4 Capitol Mall Little Rock, AR 72201-1071
Dear Mr. Simon:
I am writing in response to your request for my opinion on several questions you have raised in the wake of my issuing Ark. Op. Att'y Gen. No. 2003-014, in which I opined that, if challenged, A.C.A. § 26-80-204(18)(D) would in all likelihood be declared unconstitutional under the logic of Lake View School District v. Huckabee, 351 Ark. 31,91 S.W.3d 472 (2002). Specifically, you have posed the following questions:
Does Arkansas Code § 26-80-204(18)(B) suffer from the same constitutional infirmities as Arkansas Code § 26-80-204(18)(D)?
Does Arkansas Code § 26-80-204(18)(B) suffer from any other constitutional infirmities as a credit to the Uniform Rate of Tax mandated by Amendment 74 to the Arkansas Constitution?
RESPONSE
At issue in both of your questions is whether a millage devoted to "dedicated maintenance and operation of the schools" as statutorily defined might be credited against the 25-mill uniform rate of tax for maintenance and operations mandated by Amendment 74. In my opinion, although it is in all likelihood constitutional to credit against the uniform rate of tax millages devoted to the purposes set forth at A.C.A. § 26-80-110(b)(1) through (4), it is unclear whether a district could permissibly credit the expenses set forth in subsection (5) — viz., "[r]epaying revolving loans for any of the purposes previously listed." Specifically in response to your first question, I believe the Lake View decision may preclude crediting against the uniform rate of tax any millage devoted to the repayment of such revolving loans. If so, a statute allowing such a credit would be unconstitutional for one of the reasons I previously offered in opining that A.C.A. § 26-80-204(18)(D) is unconstitutional. However, Lake View is so confusing that it might support a directly contrary conclusion. Consequently, I cannot formally opine on this matter without further judicial clarification. In my opinion, the answer to your second question is "no." Although renovation or repair of existing facilities and the purchase of buses, furniture or equipment, and computer software — uses statutorily designated as "dedicated maintenance and operation" — may not all accord with the educational community's understanding of the term "maintenance and operations," Amendment 74 authorizes the legislature to adopt any reasonable definition of the term. The statutorily authorized uses fall well within the scope of those that have been classified as "maintenance and operations" in other contexts. Accordingly, I find nothing unconstitutional in a statute declaring that a tax levied for these purposes may be credited against the uniform rate of tax. However, I should note that in theory constitutional problems might arise if the legislature were to change drastically the current law requiring the proceeds of the uniform rate of tax to be returned by the state dollar for dollar to the districts in which they were levied. If the state in an effort to comply with Lake View were to authorize significant redistribution among districts of proceeds realized from taxes levied under the uniform rate of tax, and further if the state were to radically increase the number of mills that might be pledged to "dedicated maintenance and operation of schools," I believe it might be misleading to represent to a particular district's voters that a portion of the tax would necessarily be available for and expended upon a particular "dedicated" purpose.
Question 1: Does Arkansas Code § 26-80-204(18)(B) suffer from the sameconstitutional infirmities as Arkansas Code § 26-80-204(18)(D)?
Amendment 74 of the Arkansas Constitution provides in pertinent part:
 (b)(1) There is established a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools.
 (2) Except as provided in this subsection the uniform rate of tax shall not be an additional levy for maintenance and operation of the schools but shall replace a portion of the existing rate of tax levied by each school district available for maintenance and operation of schools in the school district. The rate of tax available for maintenance and operation levied by each school district on the effective date of this amendment shall be reduced to reflect the levy of the uniform rate of tax. If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment exceeds the uniform rate of tax, the excess rate of tax shall continue to be levied by the school district until changed as provided in subsection (c)(1). If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment is less than the uniform rate of tax, the uniform rate of tax shall nevertheless be levied in the district.
The legislation enabling the above constitutional provisions is Acts, 1997, No. 1300, § 3, codified at A.C.A. § 26-80-204(18) (Supp. 2001), which provides:
 "Uniform rate of tax" means a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools. In calculating the uniform rate of tax imposed by Arkansas Constitution, Article 14, § 3, as amended by Arkansas Constitution, Amendments 11, 40, and 74, the following categories of millage may be utilized to meet the minimum millage requirement:
(A) The local school district's maintenance and operation millage;
(B) The dedicated maintenance and operation millage[1];
(C) Excess debt service millage[2]; and
 (D) The millage derived from the ratio of the debt service funding supplements[3] divided by the total assessment.
In Lake View, the court held that subsection (C) of this statute is unconstitutional in providing "that part of a millage adopted by the school district for an entirely different purpose [viz., servicing debt that may or may not have been incurred to fund maintenance and operation of the schools] may be subtracted from the 25 mills owed" pursuant to the uniform rate of tax. 351 Ark. at 89. In Ark. Op. Att'y Gen No. 2003-014, I opined that subsection (D) of this statute is also unconstitutional because rather than crediting a millage directly devoted to maintenance and operations, it merely provided a state grant to relieve debt on the possibly unwarranted assumption that the funds thereby released from debt service would be devoted to maintenance and operation of the schools.[4]
You have asked whether I believe crediting a tax levied for dedicated maintenance and operations against the uniform rate of tax might be unconstitutional for the same reasons I proposed in opining that A.C.A. § 26-80-204(18)(D) is unconstitutional. Subsection 26-80-110(b) of the Code provides:
 Any funds received from the collection of a dedicated maintenance and operations tax shall only be used for the following purposes:
(1) Purchase of school buses;
 (2) Purchase of furniture or equipment to support the instructional program;
(3) Purchase of computer software;
(4) Renovation or repair of existing facilities; or
 (5) Repaying revolving loans for any of the purposes previously listed.[5]
With respect to items (1) through (4) listed above, I believe the answer to your question is clearly "no": the funds to be credited are not earmarked for the purpose of debt service relief, they are irrevocably dedicated to the recited uses and they are financed by taxes as opposed to some other revenue source. The conditions I found constitutionally objectionable in considering A.C.A. § 26-80-204(18)(D) consequently do not apply.
However, A.C.A. § 26-80-110(b)(5) is highly problematic both in terms of the court's discussion in Lake View and my own analysis in Ark. Op. Att'y Gen. No. 2003-014. Section 6-20-802 of the Code (Supp. 2001) authorizes school districts to borrow from the State Board of Education money contained in the Revolving Loan Fund to be used, inter alia, for the purposes recited in A.C.A. §§ 26-80-110(b)(1) through (4). Sections 6-20-807 and -808 of the Code provide that as one of various possible conditions precedent to the issuance of a revolving loan, a school district may levy as security a continuing ad valorem tax. Subsection 6-20-808(a)(1) dictates that the ballot to approve such a tax specify both the amount of the proposed loan and the purposes for which the proceeds would be used. In essence, then, in approving such a tax for dedicated maintenance and operations, the voters would be authorizing expenditures for one or more of the purposes recited in A.C.A. §§26-80-110(b)(1) through (4).
Common sense would suggest that, for purposes of determining whether a tax qualifies as a credit against the uniform rate of tax, there is no material difference between, on the one hand, expending the proceeds directly for maintenance and operation of the schools and, on the other, repaying a revolving loan that is irrevocably committed to maintenance and operation of the schools.[6] Both means serve the underlying constitutional end of committing at least 25 mills of property tax to maintenance and operation of the schools.
However, I am far from certain that the Supreme Court would adopt such reasoning as a basis for concluding that such a tax might be credited against the 25-mill uniform rate of tax. The court's pronouncements in Lake View on this subject might allow various interpretations.
On the one hand, one might read the court's dismissal of excess debt service millage devoted to "an entirely different purpose,"351 Ark. at 89, as meaning that no tax committed to debt service can ever qualify as devoted to maintenance and operation of the schools, even if the debt was incurred exclusively for that purpose. If so, a tax devoted to the repayment of a revolving loan clearly could not qualify as a credit against the uniform rate of tax, thus rendering A.C.A. § 26-80-204(18)(B) unconstitutional.
This suggestion that the court in Lake View established a black-letter rule against characterizing debt service as maintenance and operation of the schools draws some support from the fact that the court in Lake View never even mentioned that at least some portion of the excess debt service millage the court disallowed as a credit might indeed be committed to maintenance and operations. As noted in footnote 2, supra, A.C.A. § 26-80-204(9) provides that excess debt service millage "shall be presumed to be available for maintenance and operation but may be used for other school purposes, provided that the district is in compliance with the uniform rate of tax." (Emphasis added.) Implicit in the highlighted language is a directive that excess debt service millage be absolutely pledged to maintenance and operations until a district has complied with the uniform rate of tax.
I should further note that the Arkansas Department of Education, in the statistical reports it requires the various school districts to prepare annually, clearly distinguishes the category of "debt service" from the categories of "capital outlay" and "current expenditure." See, e.g., 2000-2001 Annual Statistical Report of the Public Schools of Arkansas and the Education Service Cooperatives (Arkansas Department of Education). However, the fact that debt service is a discrete category for purposes of statistical reporting does not mean that the proceeds giving rise to the debt, if devoted to a particular purpose, might not be deemed a credit toward an amount a district is constitutionally obligated to devote to that purpose.
It is unclear precisely how the court's analysis in Lake View might apply in testing the constitutionality of A.C.A. § 26-80-204(18)(B). It may be that the court indeed intended to fashion an invariable rule that a millage for debt service can never be credited against the uniform rate of tax, even if the debt being serviced was incurred solely for maintenance and operations. However, this reading of Lake View seems at odds with the spirit of Amendment 74, which is drafted to ensure only that 25 mills actually be devoted to maintenance and operation of the schools — a mandate that would not be violated if the legislature declared as a credit local mills pledged to retiring debt incurred exclusively for that purpose.
Alternatively, the court in Lake View may have been concerned only to avoid having the legislature restrict what the voters dictated might be the uses to which excess debt service millages would be put. I am informed that school district bond indentures at times specify that excess debt service millages might be devoted to "other lawful school purposes" — a designation inconsistent with any legislative declaration that such broad potential use of tax revenues will be permitted only if the uniform rate of tax has been met. In criticizing the trial court's ruling on crediting excess debt service, the Supreme Court in Lake View questioned the assumption that taxpayers, in incurring bonded indebtedness, "authorized by their votes that the excess be applied to maintenance and operation of the schools." 351 Ark. at 88. The court elaborated:
 Why taxpayers would "authorize" by implication that the excess be used for maintenance and operation and not for some other expense such as another capital expense is not explained by the court.
Id.
As the supreme court noted in Daniel v. Jones, 332 Ark. 489, 502,966 S.W.2d 226 (1998): "[V]oters' right to full disclosure as to how the tax revenues would be spent outweighs any consideration of the General Assembly's authority to establish the particular scheme of distribution of those revenues." The court prefaced this conclusion with the following:
 [T]he voters' right to be fully informed of the matter for which they are casting their votes is paramount. In other words, where the General Assembly has established the right of the voters to approve the imposition of a tax, any consideration of the legislature's general power to tax is secondary to the voters' right to full disclosure of the nature of the tax and its proposed purposes.
332 Ark. at 501. Simply stated, then, when the voters provide that tax revenues will be spent in a particular manner, the legislature cannot qualify the use of those revenues. It may be that the court in Lake View intended no more than to apply this principle, ruling that the legislature could not commit to maintenance and operations a tax that the voters may have approved for a broader purpose.
If the preceding paragraphs accurately reflect the court's concerns in Lake View, it is questionable whether the court would conclude that payments on a revolving loan are likewise ineligible as a credit. A tax levied to repay such a loan has been unequivocally committed to the end of maintaining and operating the schools from the time of its adoption — a fact the court might well take into account in determining whether the legislature might credit the tax against the uniform rate of tax. Although the court's ruling in Lake View ignores the fact that A.C.A. § 26-80-204(9) mandates reserving a sufficient portion of the excess for maintenance and operation in order to meet the uniform rate of tax, it may nevertheless be instructive in suggesting that it might be permissible to credit a millage against the uniform rate of tax so long as the proceeds of the tax, either directly or, possibly, through the application of loan revenues, will necessarily be devoted to maintenance and operation of the schools. Whereas the proceeds of a revolving loan of the sort at issue here are thus committed, this is not the case with respect to excess debt service millage, which may or may not be devoted to maintenance and operation depending, among other things, on whether a district has met its uniform rate of tax. Assuming the court indeed intended only to foreclose any legislative narrowing of the voters' purpose in levying a tax, and further assuming the purposes recited in A.C.A. §§ 26-80-110(b)(1) through (4) indeed qualified as "maintenance and operation of the schools," see discussion infra, I would answer your question "no": under these circumstances, levying a millage to repay a loan issued to realize the purposes set forth in A.C.A. §§26-80-110(b)(1) through (4)would not offend the constitution.
Of possible significance in choosing between these alternatives is the fact that subsection (b)(1) of Amendment 74 dictates only that the uniform rate of tax is "to be used solely for maintenance and operation of the schools," whereas subsection (c)(1) specifies that any additional mills a district's voters levy might be devoted to "the maintenance and operation of schools and the retirement of indebtedness." (Emphasis added.) The addition of the highlighted language in the subsection of the amendment authorizing the levying of supplemental mills might by negative implication suggest that debt service is never a permissible use of mills levied to comply with the uniform rate of tax.
However, I cannot opine that this conclusion is inescapable. This issue is in many respects similar to one addressed in Lakeside School District ofChicot County v. Gaines, 202 Ark. 778, 153 S.W.2d 149 (1941), in which the supreme court reversed a trial court's ruling that Amendment 11 precluded a school district from levying a tax in order to retire indebtedness incurred to maintain and to operate the schools.[7] At issue was the application of a constitutional provision authorizing districts to levy tax for "the maintenance of the schools, the erection and equipment of school buildings and the retirement of debt." Despite the fact that these three categories might be read as distinct from each other, the court interpreted and applied this language as follows:
 Amendment No. 11 authorizes a tax for three purposes: (1) "the maintenance of schools," (2) "the erection and equipment of buildings" and (3) "the retirement of existing indebtedness for buildings," and it is insisted that "maintenance of schools," as used in the amendment, means future maintenance and not a valid existing indebtedness for maintenance that has been incurred prior to act 194 of 1939, for which no separate tax may be voted. We cannot agree with any such narrow construction, for, if that is true, then the twelve-mill tax heretofore voted for maintenance and operation of its schools (6 mills being voted for bonds) would have to be devoted entirely to the payment of future maintenance and operations and would result in a repudiation of the existing valid warrants issued and outstanding for maintenance. In other words, if no part of the maintenance tax voted may be used to pay bonds issued for past maintenance debts, then no part of it can be used to pay the debt if no bonds are issued. It is suggested that the district should economize and create a surplus in its maintenance tax fund to pay its existing maintenance debt, and so it should. But, if it cannot use a part of maintenance tax to pay the proposed bonds, how can it lawfully pay its existing debt with a portion of such tax?
202 Ark. at 783-84. Notwithstanding the fact that "the maintenance of schools" and "the retirement of existing debt" were listed as discrete categories in Amendment 11, the court nevertheless concluded that this constitutional provision authorized imposing a tax to retire debt incurred for the maintenance and operation of schools. It may be that the current court would conclude that subsection (b)(1) of Amendment 74, even though it does not expressly mention debt service, would likewise authorize imposing a tax to retire such debt.
Having discussed the alternatives set forth in the previous paragraphs, I must regrettably conclude that I am unable to determine precisely what the court meant to say regarding crediting debt service against the uniform rate of tax. It may be that the court would not characterize as "an entirely different purpose" repaying debt that is clearly and inevitably devoted to maintenance and operation of the schools. However, I consider the court's comments on this subject indirect to the point of confusion, and I am disinclined to venture an opinion without legislative or judicial clarification. I can only opine that allowing a district to credit against the uniform rate of tax a millage used to repay a revolving loan devoted to maintenance and operation of the schools would appear to be consistent with the spirit of Amendment 74.
Question 2: Does Arkansas Code § 26-80-204(18)(B) suffer from any otherconstitutional infirmities as a credit to the Uniform Rate of Taxmandated by Amendment 74 to the Arkansas Constitution?
As previously noted, subsection (b)(3) of Amendment 74 mandates that the revenues realized from the uniform rate of tax "shall be used by the school districts solely for maintenance and operation of schools." Accord A.C.A. § 26-80-101(a). Subsection (d) of the amendment further provides that the term "'maintenance and operation' means such expenses for the general maintenance and operation of schools as may be defined by law." Unfortunately, the legislature has not defined the scope of "maintenance and operation."[8] The legislation merely repeats the term without elaboration at A.C.A. § 26-80-101(b)(1), which sets forth the procedure for collecting and distributing the taxes called for in Amendment 74, and at A.C.A. § 26-80-203(a), which sets forth legislative "findings and intent" with respect to Amendment 74.
I have already discussed the difficulties in determining whether debt service on revolving loans might be characterized as "maintenance and operation of the schools" under Amendment 74. What remains to be determined is whether the other purposes listed in A.C.A. §26-80-110(b) as permissible objects of a dedicated maintenance and operations tax — purchase of school buses; purchase of furniture or equipment to support the instructional program; purchase of computer software; and renovation or repair of existing facilities — fall within the scope of "maintenance and operation" as that term is used in Amendment 74. If so, I believe a dedicated maintenance and operations tax used for these purposes might properly be credited against the uniform rate of tax.
In matters relating to constitutional amendments the intent of the people is controlling. Bailey v. Abington, 201 Ark. 1072, 149 S.W.2d 573
[148 S.W.2d 176] (1941). See also, Faubus v. Kinney,239 Ark. 443, 389 S.W.2d 887 (1965). The "primary goal" and "fundamental rule" in the interpretation of constitutional provisions and statutes is to give effect to the intent of the people or legislature, as applicable.Rockefeller v. Hogue, 244 Ark. 1029, 429 S.W.2d 85 (1968). The Court has stated that it should constantly keep in mind the object sought to be accomplished by the Amendment's adoption, and the evils, if any, sought to be prevented or remedied, and effect should be given to the purpose indicated by a fair interpretation of the language used, and the intent may be shown by implications as well as by express provisions. Bailey, supra at 1078-79. However, in the present case, these principles are modified by the fact that section (d) of Amendment 74 provides that "maintenance and operation" shall mean "such expenses for the general maintenance and operation of schools as may be defined by law." (Emphasis added.) In my opinion, the highlighted phrase clearly reflects the voters' intent that the legislature determine, within the scope of reason, what expenses might properly be devoted to "maintenance and operations."
Black's Law Dictionary (7th ed. 1999) defines the term "maintenance" as denoting "[t]he care and work put into property to keep it operating and productive; general repair and upkeep." On occasion, the Supreme Court has accorded the term a broader reading. For instance, in McCutchen v. SiloamSprings, 185 Ark. 846, 849, 49 S.W.2d 1037 (1932), the court offered the following in interpreting a statutory provision authorizing a city or town council to "operate and maintain" waterworks:
A reversal of the decree is urged upon the ground that "operation and maintenance" used in the section of the statute quoted did not confer authority on the city council, acting in its capacity as trustee for Electric Light District No. 1, to abandon the old powerhouse and the old machinery and equipment therein and construct a new powerhouse on another tract of land and install therein modern, efficient, and more economical machinery and equipment. Appellant interprets the word "maintenance," as used in the statute, as synonymous with the word "repair," and contends that "repair" does not mean to reconstruct the system. This court, in construing the statute in question in the case of Arkansas Power Light Company v. Paragould, 146 Ark. 1, 225 S.W. 435, gave the word "maintenance" a much broader meaning than the word "repair" by saying that the purpose and meaning of the statute was to authorize the council to keep the system up to an established standard, and, in its sound discretion, to determine the way in which the standard of efficiency should be maintained. In the recent case of Anderson v. American StateBank, 178 Ark. 652, 11 S.W.2d 444, in construing the scope of the word "maintenance" in a similar statute, it was ruled that authority was conferred on the county court to purchase a tractor on the theory that it was impossible to maintain highways without machinery.
Cf. Downen v. McLaughlin, 189 Ark. 827, 829, 75 S.W.2d 227 (1934) (characterizing as "maintenance and operations" a city's construction of parallel sewer mains); Ark. Op. Att'y Gen. No. 98-230 (opining that the purchase of a new library building would constitute "maintenance" under A.C.A. § 13-2-501(c)).
This broad reading of the term is in some respects consistent with the General Accounting and Budgetary Procedures Law, which provides for the classification of appropriations for state entities into various categories, including a broadly defined category of "maintenance and general operation." A.C.A. §§ 19-4-520 and -522 (Supp. 2001). Subsection19-4-522(a) provides that "[t]his classification shall cover items of expense necessary for the proper and efficient operation of the state agency, authority, board, commission, department, or institution of higher education, except as otherwise classified in this subchapter." Subsection (d) authorizes breaking "maintenance and general operation" into various subcategories, including "operating expenses," "capital outlay" and "data processing." Among the costs identified as "operating expenses" are "[s]tate-owned motor vehicle expenses," "consumable supplies, materials, and commodities," "[e]quipment not capitalized" and "[s]uch other items of operating expense as shall be provided by the appropriation act, or under reasonable rules, regulations, and procedures issued by the Chief Fiscal Officer of the State."
Without belaboring the analysis, I will note that buying school buses, furniture or equipment to support the instructional program and computer software would appear to fall under the general category of "maintenance and operation" as just defined but not under the subclassification of "operating expenses," which appears directed more to cover day-to-day expenses. In my opinion, this same conclusion applies to renovation or repair of existing facilities.
This narrower definition of "operating expenses" is reflected in various statutes addressing educational institutions. For instance, the Postsecondary Education Reorganization Act, A.C.A. § 6-53-101 et seq. (Repl. 1996 Supp. 2001), which applies to community colleges, distinguishes as follows between the categories of "capital outlay expense" and "operating expense":
 (2)(A) "Capital outlay expense" means those funds devoted to or required for:
(i) The acquisition and improvement of land;
 (ii) The acquisition or construction of buildings or other structures or the remodeling, alteration, or enlargement thereof or the addition thereto; and
 (iii) The initial purchase of library holdings, furniture, apparatus, and other equipment for a new or expanded facility as defined by the Arkansas Higher Education Coordinating Board.
 (B) "Capital outlay expense" excludes those expenses used for maintenance and replacement of equipment and furniture.
A.C.A. § 6-53-103.
 (8) "Operating expense" means those educational and general funds devoted to or required for the regular or ordinary expense of the college, including administrative, maintenance, and salary expenses but excluding capital outlay expenses, student activity expenses, and expenses for intercollegiate athletics. "Operating expense" includes maintenance and replacement of furniture and equipment, including motor vehicles.
Id.
Similarly, the subchapter of the Code generally applicable to postsecondary institutions distinguishes these categories as follows:
6-61-501. Definitions.
 (2) "Capital outlay expense" means those funds devoted to or required for the acquisition and improvement of land; acquisition, construction, remodeling, alteration, addition, or enlargement of buildings or other structures; and initial purchase of furniture, apparatus, and other equipment;
 (3) "Operating expense" means those funds devoted to or required for the regular or ordinary expense of the college, including administrative, maintenance, and salary expenses, but excluding capital outlay expenses, student activity expenses, and expense for intercollegiate athletics.
A.C.A. § 6-61-501.
 Although its classification is hardly dispositive of this question, I will note that the Arkansas Department of Education, in designating various funds for the operation of schools, distinguishes between an "Operating Fund" designed "to record the receipts and expenditures for current operating expenses other than those that relate to the purposes set out for the other funds listed" and a "Capital Outlay/Dedicated Maintenance and Operation Fund" designed "to record the receipts and expenditures of building projects funded by millages voted and passed specifically for capital outlay and dedicated MO purposes." Arkansas School and Educational Service Cooperative Financial Accounting Manual (May 1999), at 56.
I have offered the foregoing analysis primarily to illustrate the potential range of definitions of "maintenance and operations." As suggested above, at least some of the categories of expenses contained within the statutory definition of "dedicated maintenance and operations," such as the "renovation or repair of existing facilities," A.C.A. § 26-80-110(b)(4), might at first blush more accurately be characterized as "capital expenditures," not "maintenance and operations." However, as reflected in the above discussion, the latter term has been given a wide range of meanings, including even capital outlays for the construction of entirely new facilities. You have not asked me to opine on the question of whether a tax to finance such new construction might be credited against the uniform rate of tax, and I will not here venture to do so. At issue are only the four categories of expenditure listed in A.C.A. § 26-80-110(b)(1) through (4). In my opinion, in expressly authorizing the legislature to define the term "maintenance and operation of schools," the voters invested in the General Assembly the discretion to adopt a definition sufficiently broad to include the varieties of expenditure listed in A.C.A. §26-80-110(b)(1) through (4), regardless of whether the educational community currently uses a definition so broad in its funding and accounting practices. Accordingly, I find nothing constitutionally offensive in the fact that A.C.A. § 26-80-2204(18)(B) credits the dedicated maintenance and operation millage devoted to these uses against the uniform rate of tax.
Having offered this opinion, I feel obliged to add that A.C.A. § 26-80-204(18)(B) might in theory be subject to constitutional assault if current statutory law regarding the disposition of the proceeds collected under the uniform rate of tax were to change. Amendment 74 imposes a state tax that "shall replace a portion of the existing rate of tax levied by each school district available for maintenance and operation of schools in the school district." Ark. Const. amend. 74, § (b)(2) (emphasis added). Subsection (b)(3) of the amendment provides that "the net revenues from the uniform rate of tax shall be remitted to the State Treasurer and distributed by the state to the school district as provided by law." (Emphasis added.) The state consequently has the discretion to enact legislation apportioning the aggregate revenues from the uniform rate of tax among the districts. Under current law, net revenues from the uniform rate of tax are remitted dollar for dollar "to each local school district from which the revenues were derived." A.C.A. §26-80-101(c)(1). Given this fact, it is currently the case that any tax that the local voters have dedicated to a particular use will in fact be available to be put to that use. However, in theory, at least, the legislature might in the future adopt some formula under which the revenues collected under the uniform rate of tax are drastically redistributed in order to effect equity among the districts.[9]
Notwithstanding this possibility, assuming the legislature does not significantly raise the maximum allowable dedicated maintenance and operations millage from its current level of "five percent (5%) of current expense or three (3) mills, whichever is less," A.C.A. § 26-80-110(d), there would appear to be virtually no chance that a district's recovery of its uniform rate of tax contribution following a possible redistribution would be smaller than the amount it had pledged to devote to dedicated uses. However, this theoretical possibility exists.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] I will discuss the scope of this term at length below.
[2] Subsection 26-80-204(6) of the Code defines the term "debt service millage" as follows: "Debt service millage" means the total number of mills voted by the electors of a school district to be pledged as security for the retirement of bonded indebtedness. Subsection (9) of this statute defines the term "excess debt service millage" as follows: "Excess debt service millage" means the difference between the debt service millage levied and the debt service millage required. This amount shall be presumed to be available for maintenance and operation but may be used for other school purposes, provided that the district is in compliance with the uniform rate of tax. Subsection (7) defines the term "debt service millage required" as follows: "Debt service millage required" means the calculated millage rate equal to the amount of millage pledged to mandatory callable bonds plus the result of the scheduled calendar year bonded debt payment divided by the total assessed value of real, personal, and utility property in the local school district.
[3] Subsection 26-80-204(5) defines the term "debt service funding supplements" in pertinent part as follows: "Debt service funding supplements" means the state financial aid provided to qualifying local school districts for the purpose of reducing existing debt service burdens and increasing the amount of local revenue available for maintenance and operation expenditures. . . .
[4] Although I was not asked to address the issue in either this or myquestion from that actually determined might have arisen and been litigated, therefore such possible question is to be considered as excluded from consideration in a second action between the same parties on a different demand, although loose remarks looking in that direction may be found in some opinions.") See also Commissioner v. Sunnen,333 U.S. 591, 598 (1948) (holding that the general rule of res judicata applies to tax proceedings involving the same claim and the same tax year, while the doctrine of collateral estoppel, which is a narrower version of the res judicata rule, applies to tax proceedings involving similar or unlike claims and different tax years).
[5] Subsection 26-80-110 (c)(1) of the Code provides: Local school districts which have levied a capital outlay tax or current expenditures tax prior to the amendment of this section are authorized to continue such levies for the terms and purposes approved by the majority of voters at the time of their adoption. Subsections 26-80-110(c)(2) and (3) provide that such taxes may be deemed "dedicated maintenance and operation millage." Not being privy to the precise uses to which such taxes are being put in the districts, if any, that impose them, I am unable to opine whether the districts are constitutionally authorized to credit them against the uniform rate of tax.
[6] For purposes of the present discussion, I will assume that the uses recited in A.C.A. §§ 26-80-110(b)(1) through (4) indeed qualify as "maintenance and operation of the schools." I will test that assumption in my response to your second question.
[7] Amendment 11, which amended Ark. Const. art. 14, § 3, has been superseded by Amendments 40 and 74. However, the court's analysis of the issue in Lakeside remains pertinent to my discussion.
[8] Senate Bill 892, as engrossed on March 26, 2003, which proposes, inter alia, to add to the Code a new subchapter containing modified definitions of the terms at issue in this opinion, would include the following unhelpful definition: "'Maintenance and operation millage' means millage levied by the electors of a local school district for the maintenance and operation of the school district."
[9] Subsections 26-80-101(c)(2) and (c)(3) of the Code in fact provided for a redistribution of uniform tax revenues in the 1997-98 and 1998-99 school years.